**F I L E D**
IN THE 13TH COURT OF APPEALS
CORPUS CHRISTI

09/24/15

**DORIAN E. RAMIREZ, CLERK**
**BY** Delia S. Rodriguez

ACCEPTED
13-14-00654-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
9/24/2015 11:12:16 AM
Dorian E. Ramirez
CLERK

NO. 13-14-00653-CR
NO. 13-14-00654-CR

IN THE COURT OF APPEALS

RECEIVED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
9/24/2015 11:12:16 AM
DORIAN E. RAMIREZ
Clerk

FOR THE THIRTEENTH DISTRICT OF TEXAS

AT CORPUS CHRISTI

_____

WILLIAM C. MAYS,
Appellant,

VS.

THE STATE OF TEXAS,
Appellee.

_____

ON APPEAL FROM THE 214TH DISTRICT COURT
OF NUECES COUNTY, TEXAS
TRIAL COURT NUMBERS 13-CR-3264-F AND 13-CR-3265-F

_____

BRIEF FOR THE STATE

_____

Melanie K. Good
State Bar No. 24074735
Special Assistant District Attorney
Angela Cole
State Bar No. 24012443
Special Assistant District Attorney
606 N. Carancahua, STE 803
Corpus Christi, Texas 78401
Phone: (361) 887-1085
Fax: (361) 884-7820

Attorneys for Appellee

## TABLE OF CONTENTS

PAGE

IDENTITY OF PARTIES AND COUNSEL…………………………………........iv

INDEX OF AUTHORITIES…………………………………………………….v

STATEMENT OF THE CASE…………………………………………………1

STATEMENT REGARDING ORAL ARGUMENT…………………………......2

STATEMENT OF PROCEDURAL HISTORY……………………………….......2

STATEMENT OF FACTS……………………………………………………….4

SUMMARY OF THE ARGUMENT……………………………………………..24

ARGUMENT…………………………………………………………………...28

I.  Appellant cannot raise a double jeopardy challenge for the first time on appeal without preserving any potential error at trial, and no double jeopardy violation has occurred because Appellant was convicted of and punished for two distinct offenses.………………………………………28

II. The trial court did not abuse its discretion in denying Appellant's challenge for cause of Juror No. 36 because the Judge properly examined and rehabilitated the juror, and in the alternative, even if the trial court did commit error, the error was not preserved by Appellant's trial counsel who failed to request additional preemptory strikes or even object to Juror No. 36 being impaneled on the jury……………………………………….38

III. It was not improper for the State's investigator to comment on Appellant's failure to appear pursuant to a subpoena because the Fifth Amendment privilege does not apply to pre-arrest, pre-miranda silence, Appellant never invoked his Fifth Amendment privilege, any potential error caused by the comment was cured by the trial court's instruction to the jury, and in the alternative, the comment was harmless and did not contribute to Appellant's conviction.………......................................45

IV. The trial court properly admitted evidence identifying Jerry and Marianne Sevier as investors in Appellant's program to allow the State to demonstrate how Appellant had used funds belonging to victims who were listed in the indictment, to make payments to the Seviers; such evidence is not extraneous evidence of bad acts, but in the alternative,

ii

even if it was, it was still proper because same transaction contextual evidence is admissible. …………………………………………………62

V. The Trial Court did not abuse its discretion in allowing testimony from the State's Securities Regulatory Expert that aided the jury in its understanding of an incredibly complex industry and gave an opinion on how certain facts in evidence measured up to certain terminologies within the industry.………………………….…………………………..71

VI. The trial court did not error in denying Appellant a directed verdict because when multiple offenses are aggregated into one offense, the proper venue for prosecution is any county in which any of the individual offenses, or any element thereof, occurred, even though venue for some of the individual offenses, if tried separately, would be in different counties…………………………………………………...96

VII. The trial court did not abuse its discretion in denying Appellant's request for a particularly worded instruction on witness bias because the requested bias instruction would have been duplicative and a direct comment on the credibility of the State's witnesses, in the alternative, even if it was error to deny the requested instruction, the error was harmless.………………………………………………………..101

VIII. Aside from a brief reference to the Texas Constitution, Appellant fails to cite any authority in support of his eighth issue on appeal and thereby has inadequately briefed the issue, leaving this Court nothing to review on the matter.…………………………………………………..106

IX. The evidence, viewed in the light most favorable to the prosecution, is sufficient for a rational trier of fact to have found beyond a reasonable doubt that Appellant had the requisite intent to commit securities fraud and theft……………………………………………………...108

PRAYER FOR RELIEF…………………………………………………117

CERTIFICATE OF COMPLIANCE……………………………………117

CERTIFICATE OF SERVICE…………………………………………..117

APPENDIX………………………………………………………………118

# IDENTITY OF PARTIES AND COUNSEL

The following are parties to the trial court's judgments and their counsel in the trial court:

William Charlton Mays, represented by John Gilmore, 622 Tancahua Street, Corpus Christi, Texas 78401; and Christopher Dorsey, 606 N. Carancahua, STE 1001, Corpus Christi, Texas 78401-0675.

The State of Texas, represented by Angela Cole, Melanie Good, and Rachael Luna, Attorneys with the Texas State Securities Board, sworn in as Special Prosecutors for the Nueces County District Attorney's Office, 606 N. Carancahua, STE 803, Corpus Christi, Texas 78401.

The following are appellate counsel:

John Lamerson and Jacqueline Rae Lamerson, PO Box 241, Corpus Christi, Texas 78403, representing William C. Mays.

Melanie Good and Angela Cole, 606 N. Carancahua, STE 803, Corpus Christi, Texas 78401, representing The State of Texas.

# INDEX OF AUTHORITIES

TEXAS CASES                                                                                          PAGES

*Adami v. State*, 524 S.W.2d 693 (Tex. Crim. App. 1975)………………………..43

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984)……………………104

*Alvarado v. State*, 912 S.W.2d 199 (Tex. Crim. App. 1995)……………………..71

*Bailey v. State*, 155 S.W.3d 346 (Tex. App. ---El Paso, 2004),
*rev'd on other grounds*, 201 S.W.3d 730 (Tex. Crim. App 2006)……………….78

*Bartlett v. State*, 270 S.W.3d 147 (Tex.Crim.App.2008)………………… 103, 104

*Birchfield v. State*, 401 S.W.2d 825 (Tex. Crim. App. 1966)……………………34

*Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361 (Tex.1987)……..74, 80

*Black v. State*, 645 S.W.2d 789 (Tex. Crim. App. 1983)………………………...97

*Bower v. State*, 769 S.W.2d 887 (Tex. Crim. App. 1989)………………………..52

*Bridwell v. State*, 804 S.W.2d 900 (Tex. Crim. App. 1991)……………………...79

*Campbell v. C.D. Payne and Geldermann Securities, Inc.*,
894 S.W.2d 411 (Tex. App.--- Amarillo 1995)………………………………87, 89

*Cantu v. State*, 842 S.W.2d 667 (Tex. Crim. App. 1992)………………………...72

*Cheney v. State*, 755 S.W.2d 123 (Tex. Crim. App. 1988)………………..36, 37

*Christensen v. State,* 240 S.W. 3d 25
(Tex. App. ---Houston 2007)………………………………….....108, 111, 113, 166

*Clayton Brokerage Co. of St. Louis v. Mouer*, 520 S.W.2d 802
(Tex.Civ.App. –Austin 1975), dism'd as moot on rehearing per
curiam, 531 S.W.2d 805 (Tex.1975)……………………………………………..88

*Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*,
159 S.W.3d 87 (Tex. 2005)………………………………………..38, 39, 43, 43

*Cox v. State*, 523 S.W.2d 695 (Tex. Crim. App. 1975)…………………………90

v

*Cox v. State*, 658 S.W.2d 668 (Tex. App.---Dallas 1983, pet. ref'd)……...115, 116

*Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103
(Tex. App.---Texarkana 1994)………………………………………………74, 75, 92

*Devoe v. State*, 354 S.W.3d 457 (Tex. Crim. App. 2011)………………………..67

*Dewalt v. State*, 307 S.W.3d 437 (Tex. App.--Austin 2010)……………………..97

*Digges v. State*, No. 05-10-00239-CR, 2012 WL 2444543
(Tex. App.---Dallas June 28, 2012) (mem. op., not designated
for publication)………………………………………………74, 78, 79, 90

*Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995)……………..52, 53

*Duckett v. State*, 797 S.W.2d 906 (Tex. Crim. App. 1990)………………………74

*E.I. du Pont de Nemours and Company, Inc. v. C.R. Robinson*,
923 S.W.2d 549 (Tex. 1995)……………………………………………. 72

*Escamilla v. State*, 143 S.W.3d 814 (Tex. Crim. App. 2004)……………………43

*Ex parte Hernandez*, 953 S.W.2d 275 (Tex. Crim. App. 1997)………………...106

*Gonzalez v. State*, 973 S.W.2d 427 (Tex. App.—Austin, 1998)
aff'd, 8 S.W.3d 640 (Tex. Crim. App. 2000)……………………..28, 29, 36

*Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56
(Tex. App.---Houston [14th Dist.] 2004)……………………………...82, 83, 84

*Hallet v. Houston Northwest Medical Center*, 689 S.W.2d 888
(Tex. 1985)……………………………………………………………43

*Hernandez v. State*, 829 S.W.2d 806 (Tex. Crim. App. 1991)………………….108

*Highland Capital Management, L.P.v Ryder Scott Co.*,
402 S.W.3d 719 (Tex. App. ---Houston [1st Dist.])…………………………...78

*Holden v. Widenfeller*, 929 S.W.2d 124
(Tex. App.---San Antonio 1996, pet. denied)……………………………….74

*Huett v. State*, No. 05-95-00964-CR, 1998 WL 297206
(Tex. App.---Dallas June 9, 1998) (mem. op., not designated
for publication)……………………………………………………...90

*In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434 (Tex. 2007)……………....74

*In re T.T.*, 39 S.W.3d 355 (Tex. App. ---Houston [1st Dist.]2001)……………..103

*Johnson v. State*, 357 S.W.3d 653 (Tex. Crim. App. 2012)………………….....48

*Kemph v. State*, 12 S.W.3d 530 (Tex. App.--- San Antonio, 1999)…………….105

*King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000)………………………….108

*King Commodity Co. of Texas v. State*, 508 S.W.2d 439
(Tex.Civ.App.--- Dallas 1974, no writ)……………………………………………..88

*Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997)…………………71, 72

*Langs v. State*, 183 S.W.3d 680 (Tex. Crim. App. 2006)…………….…28, 29, 30, 32

*Louder v. De Leon*, 754 S.W.2d 148 (Tex. 1988)……………………………….80

*Lyondell Petrochemical Co. v. Fluor Daniel, Inc.*, 888 S.W.2d 547
(Tex. App.-Houston [1st Dist. 1994), writ denied (Mar. 30, 1995)……………...91

*Margraves v. State*, 34 S.W.3d 912 (Tex.Crim.App.2000)………………….104

*Martinez v. State*, 754 S.W.2d 799
(Tex. App.---San Antonio 1988, pet. ref'd)…………………………………..115

*McConathy v. Dal Mac Commercial Real Estate, Inc.*, 545 S.W.2d 871
(Tex. Civ. App.---Texarkana 1976, no writ)……………………………………….78

*Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*,
29 S.W.3d 303 (Tex. App.---Houston [14th District] 2000), aff'd
145 S.W.3d 170 (Tex. 2004)………………………………………..74, 77, 80

*Merryman v. State*, 391 S.W.3d 261
(Tex. App.---San Antonio 2012, pet ref'd) …………………………………….113

*Mines v. State*, 852 S.W.2d 941 (Tex. Crim. App. 1992)………………………...39

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991)……………….66

*Moody v. State*, 827 S.W.2d 875 (Tex. Crim. App. 1992)………………………52

*Morales v. State*, 389 S.W.3d 915 (Tex. App.-- Houston, 2013)………………...45

*Moreno v. State*, 721 S.W.2d 295 (Tex. Crim. App. 1986)………………………67

*Neal v. State*, 256 S.W.3d 264 (Tex. Crim. App. 2008)……………………...56, 57

*Peterson v. State*, 645 S.W.2d 807 (Tex. Crim. App. 1983)…………………....115

*Pierce v. State,* 777 S.W.2d 399 (Tex. Crim. App. 1989)………………………..71

*Prible v. State*, 175 S.W.3d 724 (Tex. Crim. App. 2005)………………………..62

*Rhoades v. State*, 934 S.W.2d 113 (Tex. Crim. App. 1996)……………………106

*Rogers v. State,* 853 S.W.2d 29 (Tex. Crim. App. 1993)………………………...67

*Rose v. State*, 716 S.W.2d 162 (Tex. App.---Dallas 1986)………………………90

*Salinas v. State*, 369 S.W.3d 176 (Tex. Crim. App. 2012)…………………...45, 46

*Santellan v. State*, 939 S.W.2d 155 (Tex. Crim. App. 1997)……………………62

*Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637 (Tex. 1977)………...87, 88

*Shappley v. State*, 520 S.W.2d 766 (Tex. Crim. App. 1974)……………………..34

*Sifford v. State*, 505 S.W.2d 866 (Tex. Crim. App. 1974)……………………42, 44

*Snowden v. State*, 353 S.W.3d 815 (Tex. Crim. App. 2011)……………...56, 57, 58

*State v. Gonzalez*, 855 S.W.2d 692 (Tex. Crim. App. 1993)…………………....106

*State v. Weaver*, 982 S.W.2d 892 (Tex. Crim. App. 1998)…………………...97, 98

*Swap Shop v. Fortune*, 365 S.W.2d 151 (Tex. 1963)…………………….....38

*Sterling Trust Co. v. Adderley*, 168 S.W.3d 835 (Tex. 2005)……………..…77

*Taylor v. State*, 450 S.W.3d 528
(Tex. App.---Houston 2014)……………………………………108, 112, 113, 115

*Teeter v. State*, No. PD-1169-09, 2010 WL 3702360
(Tex. Crim. App., Sept. 22, 2010) (not designated for publication)…………...…28

*Templeton v. Dreiss*, 961 S.W.2d 645 (Tex. App.---San Antonio 1998).......74, 91

*Templin v. State*, 711 S.W.2d 30 (Tex. Crim. App. 1986)........................68,69

*Valdez v. State*, 623 S.W.2d 317 (Tex.Crim.App. 1979)..........................111

*Weatherby v. State*, 61 S.W.3d 733 (Tex. App.—Fort Worth, 2001)......52, 53, 56

*Weaver v. State*, 652 S.W.2d 420
(Tex. App. – Houston [1st District] 1982)...............................…43, 44

*Welder v. Welder*, 794 S.W.2d 420
(Tex. App.---Corpus Christi 1990)............................................74, 81, 82

*Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000),
cert. denied, 532 U.S. 944 (2001)...........................................…...52

*Wirth v. State*, 361 S.W.3d 694 (Tex. Crim. App. 2012)..........................108

*Wood v. State*, 573 S.W.2d 207 (Tex. Crim. App. 1978).........................…...97

*Wyatt v. State,* 23 S.W.3d 18 (Tex. Crim. App. 2000)..............................…...67

*Yount v. State*, 872 S.W.2d 706 (Tex. Crim. App. 1993)..........................…...93

FEDERAL CASES

*Blockburger v. United States*, 284 U.S. 299 (1932)........................…...32

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)..............................……...56

*Garner v. United States*, 424 U.S. 648 (1976)..............................…...48

*Highland Capital Management, L.P. v. Schneider*,
551 F.Supp.2d 173 (S.D.N.Y. 2008)..........................................90

*Minnesota v. Murphy*, 465 U.S. 420 (1984)...................…...48, 49, 50, 51

*Miranda v. Arizona*, 384 U.S. 436 (1966)...............................…..48

*Reves v. Ernst & Young*, 494 U.S. 56 (1990).........................…...87, 89

*Roberts v. United States*, 445 U.S. 552 (1980).........................…...48, 49

*S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476
(9th Cir.1972), cert. denied, 414 U.S. 821 (1973)…………………………………..88

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946)…………………………………...87, 88

*Tcherepnin v. Knight*, 389 U.S. 332 (1967)…………………………………………78

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)……………………….78

*United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)…………………….90

*United States. v. Monia*, 317 U.S. 424 (1943)……………………………………..47, 48

*United States v. Gaudin*, 55 U.S. 506 (1995)……………………………………….78

STATUTES AND RULES

Code Crim. Proc. Ann. art. 13.17 (West Supp. 2014)…………………………….....97

Code Crim. Proc. Ann. art. 36.14 (West Supp. 2014)…………………………….....103

Tex. Penal Code Ann. § 31.03……………………………………………………..33, 36

Tex. Penal Code Ann. § 31.09……………………………………………………98, 100

Tex. Penal Code Ann. § 32.32……………………………………………………...36, 37

Tex. R. of App. P. 38.1(i)…………………………………………………………….106

Tex. R. App. P. 44.2…………………………………………………………………55, 56

Tex. R. Evid. 404(b)…………………………………………………………………66, 67

Texas Securities Act
Tex. Rev. Civ. Stat. Ann. art. 581-1 et seq.
(West 2010 & Supp.2014)………...................33-35, 37, 72, 77-78, 86-87, 100, 107

OTHER AUTHORITIES

Wells, Joseph T., "Ponzi Scheme", Encyclopedia of Fraud (3d ed. 2007)………65

No. 13-14-00653-CR

No. 13-14-00654-CR

| WILLIAM C. MAYS, Appellant, | THE COURT OF APPEALS |
|---|---|
| v. | FOR THE THIRTEENTH |
| THE STATE OF TEXAS, Appellee | DISTRICT OF TEXAS |

**BRIEF FOR THE STATE**

TO THE HONORABLE COURT OF APPEALS:

**STATEMENT OF THE CASE**

This is an appeal by the defendant from a felony jury trial conducted on September 15-18, 2014, in the 214th District Court of Nueces County, Texas, before the Honorable J. Manuel Bañales. The jury found the defendant guilty of Theft and Securities Fraud as alleged in the indictments. After receiving evidence, the jury assessed punishment at 10 years on the Theft offense and 20 years on Securities Fraud offense, to be served concurrently. In his appeal from the trial court's judgment and sentences to that effect, Appellant presents nine issues for review.[1]

---

[1] While it may appear from Appellant's Brief that he has only raised eight issues, Appellant addresses an issue regarding a denial of jury bias instruction in his "Argument" section that is not listed in his "Issues Presented" or "Table of Contents" sections. (Appellant's Brief at 4-5, 8-9, 23). Appellant also seems to have mistakenly numbered two issues with the roman numeral "VII" in his "Argument" section. (Appellant's Brief at 23-24).

## STATEMENT REGARDING ORAL ARGUMENT

Believing that the facts and legal arguments are adequately presented in the briefs and record, that the dispositive issues have been authoritatively decided, and that the decisional process would not be significantly aided by oral argument, see Tex. R. App. P. 39.1, the State does not request oral argument in this case.

## STATEMENT OF PROCEDURAL HISTORY

Appellant was charged by indictment on September 26, 2013, with four felony offenses:  Money Laundering,[2] in the amount of $200,000 or more; Securing Execution of Documents by Deception,[3] in the amount of $200,000 or more; Theft,[4] in the amount of $200,000 or more; and Securities Fraud,[5] in the amount of $100,000 or more, all first degree felonies.  (1 C.R. [13-14-00653-CR, hereinafter "653"] at 6-7; 1 C.R. [13-14-00654-CR, hereinafter "654"] at 6-8) Each offense was charged separately and given a separate cause number.  On September 12, 2014, the State filed an Amended Motion to Consolidate Cause Nos. 13-CR-3264-F and 13-CR-3265-F for trial, which was granted.  (1 C.R. [653] at 80-82; 1 C.R. [654] at 83-85).  Prior to jury selection, the State moved to strike two victims named in the indictments, Marianne and Jerry Sevier, which was granted.  (2 R.R. at 6-7).

---

[2] See Tex. Penal Code Ann. § 34.02 (West 2011).
[3] See Tex. Penal Code Ann. § 32.46 (West 2011).
[4] See Tex. Penal Code Ann. § 31.03 (West 2011).
[5] See Tex. Rev. Civ. Stat. Ann. Art. 581-29 (West 2010 & Supp. 2014).

The case was tried to a jury on September 15-18, 2014. (1 C. R. [653] at 152-154; 1 C.R. [654] at 155-157). After the State rested its case-in chief, the Defense presented its case, after which the jury found Appellant guilty on the Theft and Securities Fraud offenses. (1 C.R. [653] at 107; 1 C.R. [654] at 110; 5 R.R. at 152). After receiving evidence on the issue of punishment, the jury assessed Appellant's punishment at confinement for ten years on the theft charge and twenty years on the securities fraud charge, in the Institutional Division of the Texas Department of Criminal Justice on (1 C.R. [653] at 122; 1 C.R. [654] at 128 6 R.R. at 72-73). The sentences were imposed on September 18, 2014, and the trial court ordered that they be served concurrently. (6 R.R. at 80). The trial court's judgments were signed on September 26, 2014. (1 C.R. [653] at 137-138; 1 C.R. at 143-144).

The trial court signed certificates of Appellant's right of appeal on September 18, 2014. (1 C.R. [653] at 108; 1 C.R. [654] at 114). Appellant filed first notices of appeal, pro se, on September 23, 2014. (1 C.R. [653] at 135; 1 C.R. [654] at 141.) Appellant filed second notices of appeal through defense counsel on November 10, 2014, and his appeals are now before this Court. (1 C.R. [653] at 144; 1 C.R. [654] at 150).

## STATEMENT OF FACTS

Appellant, William C. Mays, worked as Vice President of Investments for Frost National Bank in Corpus Christi, Texas for four years from around 2000 to 2004.[6] While at Frost Bank he advised customers about investing in mutual funds, annuities, stocks, and bonds. (5 R.R. at 44). When he left Frost Bank, he decided to become an independent advisor, and in September 2004, Appellant formed his own company, Mays Financial Group, with an office at One Shoreline Plaza, at 800 N. Shoreline Blvd., Corpus Christi, Texas. (5 R.R. at 46, 49). Over the next several years, until 2011, Appellant worked in an independent contractor capacity, remotely being associated with various investment advisory firms. (5 R.R. at 44-45, 51). Some of Appellant's clients at Frost Bank, including some of the victims in the indictment, transferred their accounts from Frost to the other mutual funds and annuities that Appellant was able to offer through his association with these other investment advisory firms. (3 R.R. at 54; 4 R.R. at 23; 4 R.R. at 138-139; 4 R.R. at 146; 5 R.R. at 45-46).

### Mounting Financial Difficulties

In 2009, Appellant entered into a Loan and Security Agreement with Accion Texas, Inc., giving Accion a blanket lien on all of Mays Financial Group's assets,

---

[6] Although the record does not clearly say Appellant worked at Frost from 2000 to 2004, it is derived from his testimony that he worked at Frost for four years before he became an independent advisor in 2004. (5 R.R. at 42-43:24).

including furniture, fixtures, inventory, and any accounts receivables. (7 R.R. at State's Ex. 11; 4 R.R. at 36-39). In January 2011, Appellant was sued in Travis County, Texas in connection with an unpaid residential lease, which led to a judgment against him in an amount of $20, 289. (7 R.R. at State's Ex. 8). At the time of the lawsuit, Appellant was already having trouble paying rent on a different rental home he was living in as well. (4 R.R. at 91:5-17; 7 R.R. at State's Ex. 15).

Not long after the suit in Travis County was filed, the Appellant was divorced and ordered in March 2011 to pay $1,100/month in child support. (7 R.R. at State's Ex. 7). One month after the divorce decree, in April 2011, the IRS issued a Notice of Federal Tax Lien against Appellant and his ex-wife in the amount of $42,924.56. (7 R.R. at State's Ex. 9).

Around October 2011, Appellant decided to no longer be associated with (and thus no longer supervised by) an investment advisory firm, and as of November 2011, he was no longer licensed to act as an investment advisor. (7 R.R. at State's Ex. 12A; 4 R.R. at 42; 5 R.R. at 49, 51:21). Two months later, in January 2012, Appellant was sued by American Express for unpaid credit card claims in the amount of $34,119. (7 R.R, State's Ex.10). It was during this climate that Appellant began to solicit the victims in this case.

**The Overall Investment Scheme**

From March 2011 to October 2012, Appellant solicited individuals to invest their money with his business, Mays Financial Group. Appellant knew each of the victims because he had previously served as their financial advisor while he was still registered and licensed. (3 R.R. at 54; 4 R.R. at 23; 4 R.R. at 138-139; 4 R.R. at 146; 5 R.R. at 45-46). All of the victims testified about representations Appellant had given them concerning how their money would be invested. Four of the five victims generally understood that Appellant would be trading their funds and investing the funds in commodities such as gold and silver. (3 R.R. at 31-32; 4 R.R. at 131, 134, 164). One of the victims understood that her funds would be invested in small businesses and possibly later traded. (4 R.R. at 91:5-17).

The victims received promissory notes or "Agreements" signed by Appellant, outlining the monthly returns they could expect to receive and how long the term of the investment was for, at the end of which, their principal investment could be returned to them. (7 R.R. at State's Ex. 2, 5, 13, 14, 21, 24).

**Victim: Diane Lechuga**

Ms. Lechuga testified that she first met Appellant in the early 2000's when he was working at Frost Bank as a financial advisor handling her retirement accounts and 401K. (4 R.R. at 7). In 2011, Appellant approached Ms. Lechuga about investing with him. According to Ms. Lechuga, Appellant represented to her

that he would be investing her funds in small businesses (4 R.R. at 9). Ms. Lechuga did not have sufficient funds readily available to invest; however, Appellant suggested that she borrow funds from her 401K account. (4 R.R. at 14). Ms. Lechuga followed his advice and borrowed enough to invest $25,000 on March 22, 2011. (4 R.R. at 12; 7 R.R. at State's Ex. 4).

Eliza Lujan, a financial examiner employed with the Texas State Securities Board, prepared charts summarizing the financial records and explaining how Ms. Lechuga's funds were used. (4 R.R. at 78-79). Ms. Lujan's chart, State's Exhibit 15, showed the source and use of funds deposited and withdrawn from a Mays Financial Group bank account ending in 5440, held at Frost Bank, for the time period of March 23, 2011 through April 22, 2011. (7 R.R. at State's Ex. 15). Ms. Lujan testified that the beginning balance in the account on March 23, 2011 was $64.28, and that she had identified only one deposit to the account during this time period, which was a check from Diane Lechuga for $25,000, dated March 22, 2011, the funds of which became available on March 23, 2011. (4 R.R. at 90-91).

Ms. Lujan identified and described the various expenses paid from Ms. Lechuga's funds, including a check, dated March 24, 2011, written to Dawn Green in the amount of $3,589.50 with the notation "January, February, March." (4 R.R. at 91). She testified that Dawn Green was the owner of the home at 467 Southern Street. (Id.). She identified other expenses paid out of Ms. Lechuga's funds, such

7

as: $3,030 paid to American Express, Capital One, HSBC and American Recovery Service as an agent for American Express; $1,319.56 for storage, restaurants and groceries; $1,100 paid to Celeste Robertson for child support and cash withdrawals of $2,092.50. (4 R.R. at 91-92). She testified that the ending balance on April 22, 2011 was (-$161.10). (4 R.R. at 92).

While on the stand, Appellant admitted that he had used Ms. Lechuga's funds to write a check the day after she invested with him, to pay for three months of past due rent (January/February/March 2011) for the rental home he was currently living in, at 467 Southern Street. (5 R.R. at 90, 95-96). He also admitted to using Ms. Lechuga's funds to pay for utilities, child support, health insurance, gasoline and insurance for his truck, old electric bills and a business line of credit he had opened five years earlier. (5 R.R. at 57-61). Appellant further admitted that the cash from a cash withdrawal that had been identified on the financial examiner's chart was used to pay a car title repayment loan (5 R.R. at 57).

Ms. Lechuga testified that Appellant never disclosed any negative information about his business or his personal financial condition. (4 R.R. at 17). Appellant never told her that the assets of Mays Financial Group were pledged to Accion or that her funds would be used for any other purpose than investing in small businesses. (4 R.R. at 18). She specifically testified that it was never disclosed to her that her funds would be used for paying child support, credit cards,

loan payments, rent, utility bills or negative balances on checking accounts. (Id.). Ms. Lechuga testified that if she had known her funds would be used that way or had been told about any of the financial problems Appellant and his company were having, she never would have invested. (4 R.R. at 18-19).

## Victim: Judson Hall

Mr. Hall first met Appellant around 2003-2006 when Appellant was working at Frost Bank as a financial advisor handling his 401K. (4 R.R. at 129). In 2011, Appellant approached Mr. Hall about an investment opportunity where he would be trading in stocks and commodities which would pay dividends of 6%. (4 R.R. at 131). Appellant had trading for Mr. Hall in the past, and his understanding was that 100% of his investment funds would be used for trading purposes. (Id.). Mr. Hall testified that the investment period was to be for one year, and then he could either pull his money out or become a "partner" and receive 10% after that. (4 R.R. at 132). On September 5, 2011, Mr. Hall wrote a check for $50,000 for this investment. (4 R.R. at 130; 7 R.R. at State's Ex. 21).

Mr. Hall testified that initially he was receiving his monthly payments according to the agreement, but when the payments "disappeared," he decided to terminate his agreement with Appellant. (4 R.R. at 132-133). In August 2012, Mr. Hall met with Appellant to inform him that he wanted his principal investment amount of $50,000 returned to him when his agreement matured in September

2012. (4 R.R. at 133). Appellant tried to persuade Mr. Hall to keep his funds invested with him, but Mr. Hall remained persistent that he wanted his money back. (Id.). Mr. Hall received a check from Appellant for $35,000[7] and another for $2,500 as partial return of his original $50,000 investment. (4 R.R. at 134).

The State's financial examiner, Eliza Lujan, prepared a chart showing the source and use of Mr. Hall's funds deposited and withdrawn from the Mays Financial Group bank account ending 5440, held at Frost Bank. (7 R.R. at State's Ex. 16). Ms. Lujan testified that the beginning balance on March 23, 2011 was $401.42, and she identified the main source of funds deposited during this time period as $50,000 from Judson Hall which accounted for 94% of the funds available for use in the account (4 R.R. at 93-94). She identified various expenses paid during including rent and utilities for 467 Southern Street totaling $8,636.84; cash withdrawals of $8,204.90 and $7,780 paid to an individual named Randy Graham. (4 R.R. at 96).

She also identified other expenses such as: $6,372.62 for storage, restaurants and groceries; $4,400 paid to Celeste Robertson for child support; $2,361.45 to Texaco, Shell, Access Ford and G&L Detail; $1,353 to Capital One and HSBC and $1,064 in loan payments to Accion Texas, Inc. (4 R.R. at 96). Ms. Lujan also

---

[7] On October 16, 2012, Stephen and Susan Morris invested $50,000 with Appellant. The following day, Appellant wrote a check to Victim Judson Hall for $35,000, using the funds invested by Mr. and Mrs. Morris. (4 R.R. at 101).

identified one payment of $2,500 to a TD Ameritrade account ending in 1793 under the name of William C. Mays. Ms. Lujan testified that the ending balance in the Frost Bank account on January 13, 2012 was ($229.87). (4 R.R. at 96-97).

On another chart, States' Exhibit 17, Ms. Lujan identified what happened to the $2500 that had been sent to Appellant's TD Ameritrade account ending in 1793. (7 R.R. at State's Ex.17). She explained to the jury that the $2,500 was the only source of funds deposited to the TD Ameritrade account from November 2011 through July 2012. (4 R.R. at 98). Ms. Lujan testified that she identified securities purchased in the amount of $617.62 on November 16, 2011, and that the next day, Appellant settled the transaction for a loss of $502.97. (4 R.R. at 98:24-25). Ms. Lujan explained that the remaining funds from the original $2,500, which after the purchase and loss was $1,850, was transferred back to Appellant's account at Frost Bank. (4 R.R. at 98). Ms. Lujan summarized State's Exhibit 17 as ultimately showing that of the $50,000 invested by Judson Hall, only $617.62 was used for trading. (4 R.R. at 99).

During Appellant's testimony, he admitted that he used Mr. Hall's funds to pay rent, utilities and house cleaning at his home at 467 Southern. (5 R.R. at 66). Appellant testified that he paid his child support, made purchases at Texaco, Shell and G&L Detail, and paid money to Randy Graham to settle a lawsuit. (5 R.R. at 68, 72). He also admitted to using Mr. Hall's funds to pay for storage, restaurant

11

and groceries expenses, and for payments towards his Capital One and HSBC credit cards, which Appellant claimed were mixed personal and business expenses. (5 R.R. at 68, 72-73).

Mr. Hall testified that Appellant never disclosed any negative information to him about his personal financial condition or that of Mays Financial Group. (4 R.R. at 136). Nor did he disclose to Mr. Hall that the assets of Mays Financial Group were pledged to Accion Texas, that he had a pending IRS tax lien or a final judgment against him for more than $20,000 in connection with a lawsuit for unpaid rent. (4 R.R. at 135). Mr. Hall testified that Appellant never disclosed to him that he would use his funds for any other purpose than trading, and if he had known how Appellant was going to use his funds, or any of the information about the judgment, tax liens, or his financial condition, he would not have invested with Appellant. (4 R.R. at 136).

**Victim: Kathleen Trial**

Mrs. Trial, a retired 72 year old woman, remembers first meeting Appellant sometime around 2005, when he was assigned to be her financial advisor at Frost Bank. (3 R.R. at 26, 28-29). In 2012, Appellant contacted Mrs. Trial about an investment opportunity that involved buying and selling commodities such as gold and silver. (3 R.R. at 30-31). Mrs. Trial testified that Appellant represented to her that the investment would last for one year, and it would pay 1.5% return on a

12

monthly basis, at the end of which she could decide whether she wanted her principal returned to her or if she wanted to keep it invested. (3 R.R. at 31-32, 35; 7 R.R. at State's Ex. 2). Mrs. Trial told Appellant that she didn't want to do anything that was unsafe. Appellant never discussed any risks with Mrs. Trial. (3 R.R. at 31:5-15, 32:6-11) On August 9, 2012, Mrs. Trial signed a check that Appellant filled out for her to invest $25,000 with Mays Financial Group. (7 R.R. at State's Ex. 1). Appellant filled out the check for Mrs. Trial (with the exception of her signature) due to the tremors in her hands. (3 R.R. at 32-33).

Mrs. Trial testified that she received monthly payments for September, October, November and December of 2012, and eventually, after much difficulty, received a payment in January. (3 R.R. at 36). January was the last payment they ever received from Appellant. (Id.). Thereafter, Mrs. Trial testified that she stayed in contact with Appellant through text messaging. The State introduced, and had Mrs. Trial read from, screen shots that she had taken on her phone of text message conversations she had with Appellant. (7 R.R. at State's Ex.3). A sample of some of the text message conversations follows, as read by Mrs. Trial:

January 7, 2013, 12:51 p.m.

Hey Ms. Kay, Happy New Year. Working on closing the books for 2012. Dividens [sic] will be out shortly.

My response: Thank you. Did you go public?

13

Not yet, about 18 to 24 months away, working on a project to import water from Alaskan glaciers.

Oh, my gosh, that's a ways from gold and silver; what's the deal.
Still focused on the futures, this is just another arrow in the quiver.

(3 R.R. at 41). Mrs. Trial testified that she was surprised at Appellant's comment about importing water, because he had never mentioned anything else but the gold and silver commodities to her. (3 R.R. at 41). Much of the text message conversations focused on Mrs. Trial trying to get monthly payments that were past due, below is another example, as read by Mrs. Trial:

Where are our dividens? [sic]

February 21, 2013 at 1:03 p.m.

I know I agreed to the 1st through the 6th, that is a deadline for me. Just hang in there, I will always protect you guys.

You sent me a text last week and told me you would deposit February and March on Wednesday, February the 20th, I trust you to keep your word, but I am losing that feeling of trust. Where can we meet?

In Dallas, we'll be in CC in 2 weeks. Please just relax, you are my partner, will always take care of you guys.

You can transfer our dividens [sic] from anywhere to anywhere. You are not answering my question, which is: Why have we not received our dividens? [sic] Are you out of funds?

February 21st, 2013 at 1:37 p.m.

Your dividens [sic] will transfer, I guess it's within 48 hours. My thoughts are these…this company will go public in the next 2 years, which means you guys command 5% of the company. The first year

is always a test for me because business on this side is ruthless.  At 12% that's a gift.

I appreciate the fact that you see business as an exciting challenge but we do not.  We went into this thinking we would make a small amount of interest in a safe investment.  We are not interested in making big money, just at investment.  Just a steady increase.  I am not comfortable with staying in this type of investment.  Plan on pulling out funds out at the end of our one year.

(3 R.R. at 46-47).  The State's financial examiner prepared a chart, State's Exhibit 18, showing how Mrs. Trial's funds were used.  (7 R.R. at State's Ex. 18).  Ms. Lujan testified that the beginning balance of Appellant's account on August 7, 2012 was $8.00, and she identified a $25,000 check dated August 10, 2012 from Giles and Kathleen Trial. (4 R.R. at 99).  Ms. Lujan described the various expenses paid out of this account including, $5,025.89 for rent and utilities; $3,100 payable to Celeste Robertson for child support; and $3,090 in cash.  (4 R.R. at 100).  She further identified payments totaling $3,000 to Jerry & Jodie Sevier, Giles and Kathleen Trial, and Jud Hall and $1,935.81 to various stores including Warehouse Liquors, HEB & Sprouts. (4 R.R. at 100). Ms. Lujan also identified a transfer of $20,000 to a TD Ameritrade account ending 5177; however, Ms. Lujan testified that when she reviewed the TD Ameritrade account, the vast majority of those funds were sent back to the Frost Bank account without ever being traded. (4 R.R.

15

at 99-100, 103:21-104:7). Ms. Lujan testified that the ending balance of the Frost Bank account on October 15, 2012 was $234.50. (4 R.R. at 99-100).

Mrs. Trial testified that Appellant never disclosed any negative information about his personal financial condition or that of Mays Financial Group. (3 R.R. at 47). She also testified that Appellant never told her that her money would be used for paying rent, loan payments, groceries or child support. Mrs. Trial testified that if Appellant had disclosed to her that he would be spending her money on any of those things she would not have invested with him. (3 R.R. at 47-48).

**Victims: Susan and Stephen Morris**

Mr. and Mrs. Morris first met Appellant around early 2000. He was their financial advisor at Frost Bank. (4 R.R. at 162). Appellant informed Mr. Morris that he was retiring, and about a year after that, Appellant contacted Mr. Morris and told him about an investment opportunity he had for him. (4 R.R. at 163). Appellant represented to Mr. Morris that he had put together about four or five people who were pooling their money with him and that he had been doing very well. (4 R.R. at 164). Appellant offered Mr. Morris the opportunity to invest in commodities with him, and told Mr. Morris that the minimum investment amount was $100,000. (Id.).

Mr. Morris did not invest with Appellant at this time, but about a year later. Appellant approached Mr. and Mrs. Morris again, this time stating that the

minimum amount to invest had decreased to $25,000. (4 R.R. at 164). Again, Appellant represented to Mr. Morris that he would be investing in commodities. (Id.). Appellant represented to Mr. Morris that the investment period was for one year, and then he could have his money back or decide to stay invested with him. (4 R.R. at 164-165).

Appellant told Mr. Morris that after three years, his company would be going public and there was a possibility that if stayed invested that long, he could triple his money. (4 R.R. at 165). Mr. Morris, however, specifically told Appellant that he and his wife could only do the investment for one year, and after that he would need his money back. (Id.). Appellant told Mr. Morris that for a $50,000 investment he would receive a $500 monthly dividend payment. Appellant did not discuss any risks related to the investment opportunity. (4 R.R. at 165).

On October 16, 2012, Mr. and Mrs. Morris agreed to invest $50,000 with Mays Financial Group and Mrs. Morris deposited the check into Appellant's account at Frost Bank. (7 R.R. at State's Ex. 23). After a lot of phone calls and texts sent to Appellant, Mr. and Mrs. Morris received only two dividend payments. (4 R.R. at 155). Due to the failure of Appellant to follow the agreement regarding monthly payments, Mr. Morris requested their money back. (4 R.R. at 166). According to Mr. Morris, Appellant told him they would have to wait until the one

year period expired and then he would return their funds and all the interest he hadn't paid. (Id.). Mr. Morris testified that Appellant never returned their funds. (4 R.R. at 166-167).

Ms. Lujan, the financial examiner from the Texas State Securities Board, prepared a chart, State's Exhibit 19, showing how Mr. and Mrs. Morris' funds were used. (7 R.R. at State's Ex. 19). Ms. Lujan testified that the beginning balance of Appellant's account on August 7, 2012 was $234.50, and she identified a $50,000 check from Stephen and Susan Morris dated October 16, 2012 which accounted for over 73% of the funds available for use during the time period from October 16, 2012 thru February 5, 2013. Ms. Lujan identified various expenses paid during this time period, including a $35,000 check written on October 16, 2012 payable to Jud Hall with the notation "principal return." (4 R.R. at 100). She identified other checks payable to other investor/victims including: Jud Hall ($2,500), Giles & Kathleen Trial ($1,125), Stephen & Susan Morris ($1,000) and Diane K. Lechuga ($544.48) totaling $42,669.48 or almost 63 % of the funds available. (4 R.R. at 100-101).

She further identified other expenses including, rent, utilities, and house cleaning ($5,466.79); cash withdrawals ($1,980.85); child support ($1,100) and one transfer of $14,000 to a TD Ameritrade account ending in 5177 in the name of Mays Financial Group. Ms. Lujan, however, testified that the vast majority of the

18

funds sent to the TD Ameritrade were not traded, but instead were sent back to Appellant's Frost Bank account. (4 R.R. at 103:23-104:1, 109:13-23; 7 R.R. at State's Ex. 20). She testified that the ending balance of Appellant's Frost Bank account as of February 5, 2013, was ($-1.71). (4 R.R. at 102).

During his own testimony, Appellant acknowledged that the only investor who received more than $2,000 in returns was Jud Hall. Appellant also acknowledged that his bank account only had $234.50 available prior to the investment of Mr. and Mrs. Morris. Appellant admitted that on the same day he the investment check for $50,000 from Mr. and Mrs. Morris was deposited to his account, he then wrote a check for $35,000 on the same day to return Judson Hall some of his principal. (5 R.R. at 105-106)

Mr. Morris testified that Appellant never disclosed any negative information to him about his personal financial condition or that of Mays Financial Group. (4 R.R. at 167). Nor did he disclose to Mr. Morris that the assets of Mays Financial had been pledge, that the IRS filed a Notice of Tax Lien against him or that there was a final judgment against him for more than $20,000. (4 R.R. at 167-168). Mr. Morris said that Appellant never disclosed that he would use his funds for any other purpose than trading commodities. (4 R.R. at 167-168) Furthermore, he testified that Appellant never disclosed to him that he was no longer registered with the State as an investment advisor at the time of his investment (4 R.R. at

168).  Mr. Morris testified that if it had been disclosed to him that Appellant would be spending his funds in the manner he did, or if Appellant had disclosed to him information showing that he and his company were suffering financially, he would not have invested. (4 R.R. at 169).

## Investigator Sabban

Rani Sabban, an investigator for the Texas State Securities Board, testified at trial regarding his interview of Appellant.  While Appellant initially did not appear pursuant to an administrative subpoena that the Texas State Securities Board had issued to him, the Appellant later voluntarily came into the headquarters of the Texas State Securities Board in Austin, Texas, to informally speak with Investigator Sabban.  (4 R.R. at 42-43, 49).  The interview took place in July 2013, two months before Appellant was indicted (4 R.R. at 49; 1 C.R. [653] at 7; 1 C.R. [654] at 8).  At the time of the interview, Appellant was not in custody, and was free to leave at any time. (4 R.R. at 58, 64).

The Texas State Securities Board had requested that Appellant bring with him documentation concerning his business, Mays Financial Group, and investments that he had sold in relation to his business.  (4 R.R. at 43, 58-59, 76-77).  When Appellant arrived at the Texas State Securities Board headquarters, he had brought with him two promissory notes he had given in exchange for money

from two individuals, Marianne and Jerry Sevier.[8]  (4 R.R. at 76-77; 7 R.R. at State's Ex. 13, 14).  Appellant identified Marianne and Jerry Sevier as investors with Mays Financial Group. (4 R.R. at 60).  Appellant did not produce to Investigator Sabban any of the agreements or promissory notes for Diane Lechuga, Kathleen Trial, Judson Hall, or Susan and Stephen Morris, though when asked about these individuals, he acknowledged that they also were investors in his program.  (4 R.R. at 59-60, 66, 76-77).

Investigator Sabban testified that he asked Appellant to describe in general how his investment program at Mays Financial Group worked, and that Appellant stated that his program involved him taking investor funds and trading them in the futures market, making them a 6% rate of return. (4 R.R. at 60-61).  Appellant was asked by Investigator Sabban what he specifically did with the victims' money once he had received their investment funds. (4 R.R. at 61).  Appellant represented to Investigator Sabban that he had deposited all of the victims' funds into his Mays Financial Group account at Frost Bank, and from there had transferred "100 % of the funds" to a TD Ameritrade account, where he would use the funds in trading. (Id.).  Appellant also represented to Investigator Sabban that he made daily trades

---

[8] Marianne and Jerry Sevier were the two victims that the State moved to be stricken from the indictment, which the trial court granted. (2 R.R. at 6-7).

out of the TD Ameritrade Account and had been earning an average of $6,000 per day. (Id.).

When questioned by Investigator Sabban as to what he was doing with these profits, Appellant stated that 6% of the profits were being transferred out of the TD Ameritrade Account to go back to his investors, and then anything over a 6% profit, he would keep as pay for himself, which was on average about $3,000 to $4,000 a month. The State's financial examiner, Eliza Lujan, who analyzed the TD Ameritrade account and created a chart summarizing the account statements, specifically testified that these claims by Appellant concerning his use of investor funds and the amount of profits he was generating from trading, were false. (4 R.R. at 110-111; 7 R.R. at State's Ex. 20).

Appellant admitted to Investigator Sabban that there was no money left in the TD Ameritrade account. (4 R.R. at 62). When Investigator Sabban inquired as to whether he had lost all the money trading, Appellant admitted there had been some trading losses, but nothing significant. (Id.). When pressed for what actually had happened to the victims' money, Appellant couldn't give the Investigator an answer. (4 R.R. at 62). Investigator Sabban asked Appellant if he ever had discussed any potential risks of the investment with the victims before they invested. (4 R.R. at 63). He testified that Appellant represented to him that he had told each victim that the investment would be risky and that it would be pretty

much a "crapshoot", and they were just going to have to trust him. (4 R.R. at 63.64).

## Appellant's Testimony

Appellant testified that he was a licensed securities investment adviser for 16 years and that he was aware of the rules requiring full disclosure of information about an investment when promoting an investment to any potential investors. (5 R.R. at 96). He also stated that he was aware of the rules within the industry that required quarterly disclosure of advisers to their employer firms on any significant financial matters they may have pending, including judgments and liens that an adviser might have. (Id.).

Appellant admitted during his testimony that he did not disclose to the victims that he would be using their funds for personal expenses. (5 R.R. at 97). He further admitted that he did not disclose other important financial information to the investors, including the federal tax lien filed against him; the Travis County judgment for more than $20,000 against him; or that the assets of Mays Financial Group had been pledged to Accion Texas. (5 R.R. at 97-98). Appellant testified that he planned to use investor funds for both business and personal expenses; however, he admitted that he did not have specific discussions with the investors about business expenses because the victims had not specifically asked him about it. (5 R.R. at 52, 102).

23

## SUMMARY OF THE ARGUMENT

Appellant cannot raise a double jeopardy challenge for the first time on appeal because he did not preserve any potential error at trial, and there is no double jeopardy violation apparent from the face of the record. Further, there is no double jeopardy violation in this case because Appellant was convicted and punished for the two distinct offenses of securities fraud and theft. These offenses require different elements and the statutes from which both offenses arise are clearly aimed at punishing different conduct.

The trial court did not abuse its discretion in denying Appellant's challenge for cause of a large group of veniremembers during voir dire, which included Juror No. 36, a juror that was impaneled on the jury. It was not an abuse of discretion for the trial court to deny Appellant's challenge for cause because the trial court judge, after further examination and clarification of Juror No. 36, and the rest of the veniremember group, was able to properly rehabilitate them and find that the venire members had either misunderstood the law or had been confused about the question that had been originally posed to them by Appellant's trial counsel. More importantly, however, Appellant's trial counsel not only failed to use a preemptory strike on Juror No. 36, but he also failed to request further preemptory strikes or even object to Juror No. 36 being impaneled.

The trial court did not commit error in denying Appellant a mistrial on the grounds that the State's investigator had commented on the fact that Appellant initially failed to appear pursuant to an administrative subpoena. This comment was not improper because the Fifth Amendment privilege does not apply to pre-arrest, pre-miranda silence, and Appellant's failure to appear pursuant to the subpoena took place before his indictment and arrest. Moreover, Appellant is further barred from invoking the Fifth Amendment's protections because he never invoked his Fifth Amendment privilege. Also, any potential error caused by the comment was cured by the trial court's instruction to the jury to disregard the comment, and in the alternative, even if the instruction to disregard did not cure the error, the comment was harmless and did not contribute to Appellant's conviction.

The trial court did not abuse its discretion in admitting evidence identifying Jerry and Marianne Sevier as investors in Appellant's program. Such evidence was not extraneous evidence of bad acts against the Seviers, but instead was evidence presented by the State to demonstrate how Appellant had used funds belonging to the victims who remained in the indictment, since the State presented evidence that Appellant made payments to the Seviers out of other investors' funds. By admitting Appellant's own statements to the State's investigator that the Seviers were investors in his program, the State was able to prove that Appellant was using investors' money in his program to pay other earlier investors. In the

alternative, even if this Court were to find that such evidence was extraneous evidence of bad acts, the trial court still did not abuse its discretion in admitting the evidence because same transaction contextual evidence is admissible.

It was not an abuse of discretion for the trial court to allow testimony from the State's Securities Regulatory Expert. The State's expert in this case gave an appropriate opinion on whether certain transactions in the case were "securities" and whether certain facts in the case were "material". Such questions have been recognized by both Texas and federal authorities to be mixed questions of law and fact. Ultimately, the State's expert gave opinions that aided the jury in its understanding of an incredibly complex industry and its determination of how certain facts in evidence measured up to terminology within the securities industry.

In this case, the evidence was sufficient to find that venue in Nueces County was proper for the offenses involving one of the victims, Susan Morris, who resided in San Patricio County, because Appellant was charged with aggregated offenses, and several of the offenses that were aggregated with the offense involving this victim occurred in Nueces County, Texas.

The trial court did not abuse its discretion in denying Appellant's request for specific language in the jury charge relating to witness bias. As far as Appellant's bias instruction reflected the law, it would have been duplicative to what the trial court had already included in its charge. However, Appellant's remaining

26

requested language ultimately would have amounted to the judge commenting on the credibility of the government's witnesses and giving what would appear to be his own suggestion to jurors on how they should specifically evaluate a witness' credibility. In the alternative, even if it was an abuse of discretion, the denial of such an instruction was harmless, in that Appellant's trial counsel clearly communicated to the jurors their belief of bias on the part of the State's expert witness through cross examination and closing argument.

Aside from a brief reference to the Texas Constitution, Appellant fails to cite any authority in support of his eighth issue on appeal, claiming that Appellant had been imprisoned for a mere debt in violation of the Texas Constitution. Appellant has inadequately briefed the issue, and has thus left this Court nothing to review on the matter.

Finally, evidence was sufficient to find that the Appellant had the requisite criminal intent to commit securities fraud and theft because evidence at trial established that Appellant did not use investor funds according to his agreement with the investors, but instead used the vast majority of these funds for his personal benefit, often times on the very same day the investors' submitted their funds to him. Furthermore, any minimal performance by Appellant could very well have been an attempt on his part to appear that he was using funds in a proper manner, and does not negate the intent he had to deprive and defraud the victims.

27

## ARGUMENT

**I. Appellant cannot raise a double jeopardy challenge for the first time on appeal without preserving any potential error at trial, and no double jeopardy violation has occurred because Appellant was convicted of and punished for two distinct offenses.**

### A. Appellant is barred from bringing a double jeopardy claim for the first time on appeal because he did not preserve any potential error at trial and no such violation is apparent on the face of the record.

An appellant can forfeit a potential multiple-punishment double-jeopardy claim if he did not properly preserve such a claim at trial. *Gonzalez v. State*, 973 S.W.2d 427, 431 (Tex. App.—Austin, 1998) *aff'd*, 8 S.W.3d 640 (Tex. Crim. App. 2000) ("We regard it as the appellant's burden to preserve, in some fashion, a double jeopardy objection at or before the time the charge is submitted to the jury."); *Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006) ("This court has, however, made it clear that a potential multiple-punishment double-jeopardy claim may be forfeited if a defendant does not properly preserve that claim."); *see also Teeter v. State*, No. PD-1169-09, 2010 WL 3702360, at 2 (Tex. Crim. App., Sept. 22, 2010) (*not designated for publication*).

When an appellant fails to preserve a potential multiple-punishment double jeopardy claim at the trial level, the only way such a claim may be brought for the first time on appeal is if undisputed facts show that a double jeopardy violation is clearly apparent from the face of the record. *Langs*, 183 S.W.3d at 682 ("In this case we reiterate that the face of the trial record must clearly show a double

28

jeopardy violation before a defendant may successfully raise a 'multiple punishment' double jeopardy claim for the first time on appeal.") The Texas Court of Criminal Appeals has made clear, however, that "when separate theories for an offense are issued to the jury disjunctively, a double jeopardy violation is not clearly apparent on the face of the record if one of the theories charged would not constitute a double jeopardy violation and there is sufficient evidence to support that valid theory." *Id.* at 687; *see e.g. Gonzalez*, 973 S.W.2d at 431 ("The record in this case is clear that no objection was made, and thus the jury's general verdict finding appellant guilty of both aggravated robbery and injury to an elderly person is proper under the circumstances.").

Appellant in this case failed to raise any double jeopardy challenges prior to trial, and made no double jeopardy objections at trial, and thus has forfeited his right to raise such a claim for the first time on appeal. Furthermore, the undisputed facts of the case do not demonstrate a double jeopardy violation that is clearly apparent from the face of the record. Appellant was convicted of both securities fraud and theft. The State charged Appellant with securities fraud in the disjunctive, listing various manner and means in which jurors could find that he had committed fraud against the victims. (1 C.R. [654] at 6-8, 105-106).

Among the manner and means that were charged were intentionally failing to disclose to victims, prior to their investment with Appellant, that the assets of

Mays Financial Group had already been pledged to Accion Texas, that the IRS had already filed a tax lien in the amount of $42, 924.56 against Appellant, and that a judgment in the amount of $20, 289.59 had been obtained against Appellant for unpaid rent. (1 C.R.[654] at 6-8, 105-106).The State further charged Appellant for failing to disclose his personal financial condition and the financial condition of his company, Mays Financial Group. Id. It is important to note that all of these referenced disjunctive manner and means of committing fraud in no way involve what Appellant actually did with the victim's funds- that goes towards the offense of theft, which necessarily requires an appropriation of property.

The State further charged in the disjunctive that Appellant had failed to disclose to victims that their funds would be used for purposes other than those the victims had intended the funds to be used for, including paying his personal expenses. (1 C.R. [654] at 6-8, 105-106). While these failures to disclose at least closely resemble some of the elements of theft, the distinction that remains is that the offense of securities fraud is what Appellant *failed to tell* his victims *before* they invested, not what he did after. The only reason that some of the evidence to prove theft and some of the evidence to prove this particular manner and means of fraud would be the same is because, in order to prove that Appellant failed to disclose to victims what he actually intended to do with the funds, the State must necessarily show what he did with their funds. Ultimately, however, the State

charged the Appellant disjunctively, allowing the jury to find him guilty of securities fraud by choosing any one or a combination thereof of the different manner and means paragraphs that were listed in the jury charge.

In the case of *Langs v. State*, the Texas Court of Criminal Appeals found that there was not a double jeopardy violation apparent from the face of the record because at least one of the theories that had been charged in the disjunctive would not have constituted a double jeopardy violation. 183 S.W.3d at 687; *see also Gonzalez*, 973 S.W.2d at 431 ("We conclude that as long as the *general verdict* of the jury can be reconciled in such a fashion that it does not implicate the double jeopardy clauses of the federal and state constitutions, then the convictions and punishments must stand.")

The Court of Criminal Appeals held in *Langs* that "[t]he fact that the jury's verdict *could* have relied on a theory that would violate the Double Jeopardy Clause, is not sufficient to show a constitutional violation 'clearly apparent on the face of the record.' " *Langs*, 183 S.W.3d at 687. Thus, under *Langs*' rationale, a general verdict of securities fraud with several disjunctive theories will not constitute a violation clearly apparent from the record if any of those theories charged by the State would not constitute a double jeopardy violation with theft.

Given the various manner and means of fraud that were charged to the jury were based upon judgments and liens that were not disclosed to victims, the jury's

general verdict finding Appellant guilty of securities fraud is enough for this Court to find, as the Texas Court of Criminal Appeals did in *Langs*, that there is no double jeopardy violation apparent from the face of the record. As such, because Appellant failed to raise a double jeopardy objection at trial, this Court should find that Appellant has forfeited his right to bring this claim for the first time on appeal.

**B. Appellant was charged with the two distinct offenses of securities fraud and theft which require different elements and the statutes from which both offenses arise are clearly aimed at punishing different conduct.**

The Texas Court of Criminal Appeals adheres to the "same elements" test first espoused in *Blockburger v. United States*, 284 U.S. 299 (1932), in determining if two convictions constitute "multiple punishments" under the Double Jeopardy Clause. *Langs*, 183 S.W.3d at 685. In *Langs*, the Court stated:

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Id.* As this rule indicates, an individual in the same transaction can be guilty of separate offenses. Appellant's only support for his double jeopardy claim is the single observation that "[e]ach offense references the same money Defendant received through his business." (Appellant's Brief at 14). Appellant incorrectly stated in his brief that he had been charged with two offenses under two provisions of the Texas Penal Code that related to fraud and theft. (Appellant's Brief at 12).

32

While Appellant was in fact charged with Theft under Texas Penal Code § 31.03, he was also charged with Securities Fraud under Section 29-C of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-1 et seq. (West 2010 and Supp. 2014), a completely separate statute from the Texas Penal Code. Both offenses require proof of facts that the other does not. Below is a side by side element comparison:

| 2ND DEGREE THEFT | 1ST DEGREE SECURITIES FRAUD |
| --- | --- |
| 1. The Defendant, William C. Mays | 1. The Defendant, William C. Mays |
| 2. In Nueces County, Texas | 2. In Nueces County, Texas |
| 3. did then and there, on the dates listed below | 3. did then and there, on the dates listed below |
| 4. unlawfully appropriate, to wit: acquire or otherwise exercise control over property other than real property | 4. directly or through agents |
| 5. to wit: current money of the United States of America | 5. sell *or* offer for sale |
| 6. from the following owners on the dates alleged and in the following amounts… | 6. promissory notes and Agreements by William Mays or The Mays Financial Group |
| 7. and said appropriations were without the effective consent of said owners… | 7. being securities, to wit: promissory notes and investment contracts to each of the persons listed below on the dates alleged and in the following amounts… |
| 8. and all of said amounts were obtained as alleged as part of one scheme and continuing course of conduct and | 8. and the Defendant committed fraud in connection with the sales or offers for sale of said securities by [list of failures to disclose/misrepresentations] |
| 9. the aggregate value of the property so appropriated was more than $100,000 but less than $200,000 | 9. and all of said amounts were obtained pursuant to one scheme and continuing course of conduct |
| | 10. and the aggregate amount that was obtained was $100,000 or more. |

Without even listing the seven different manner and means of fraud under Securities Fraud in these charts, it is clear from a side by side comparison that both offenses contain different elements. The most obvious element that must be met in Securities Fraud, that is not required in Theft, is that there must be a security. More importantly, however, and the key distinction that goes to the heart of securities fraud, is that securities fraud may be committed without a sale ever taking place, or money ever changing hands. This is significant because one of the required elements for theft is that there must be an unlawful appropriation over property.

Under the Texas Securities Act, a person commits securities fraud when they engage in fraud or a fraudulent practice "[i]n connection with the sale, *offering* for sale or delivery of the purchase, *offer* to purchase, *invitation of offers* to purchase, *invitations of offers* to sell, or dealing in any other manner in any security or securities." Tex. Rev. Civ. Stat. Ann. Art. 581-29-C (1) (emphasis added). In other words, the TSA's fraud proscriptions apply to both cases where a sale was made and those in which an alleged perpetrator has only made offers or solicitations. *See Birchfield v. State*, 401 S.W.2d 825, 828 (Tex. Crim. App. 1966) *and Shappley v. State*, 520 S.W.2d 766, 768 (Tex. Crim. App. 1974) (Where both courts found that reliance on a particular misrepresentation or failure to disclose is

not required under the Act since violations can occur through mere offers and solicitations.)

Thus, if a person can commit securities fraud through offerings and solicitations, the true nature or gravamen of the offense itself that the legislature was seeking to punish is the fraud itself, since a sale or a deprivation of property is not required. In the jury charge in this case, which tracked the language in the Texas Securities Act, "fraud and fraudulent practice" were defined as "any misrepresentations, in any manner, of a relevant fact; or an intentional failure to disclose a material fact; or any scheme, device or other artifice to obtain a commission or profit so gross or exorbitant as to be unconscionable." (1 C.R. [654] at 104); *see* Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-4(F).

The legislature, by seeking to punish securities fraud, even if no sale was consummated, was seeking to punish the particular conduct of engaging in misrepresentations and intentionally withholding information in connection with securities. Thus, the offenses that Appellant was convicted of could be described as punishing both Appellant's acts *prior* to victims investing with him, in which he failed to disclose a number of material facts to them, and punishing his acts *after* the victims invested with him, in which he used their investment funds for his personal benefit.

Texas courts have attributed such distinctions to the State legislature's intent in many similar cases. In *Gonzalez v. State*, the Third Court of Appeals held, and the Texas Court Criminal Appeals Court affirmed, that an appellant could be convicted and punished for both the crimes of aggravated robbery and injury to an elderly person, despite the fact that both offenses stemmed from the same single incident. 973 S.W.2d 427, 430-31 (Tex. App. –Austin, 1998) *aff'd,* 8 S.W.3d 640 (Tex. Crim. App. 2000). The Third Court of Appeals in its rationale pointed to the fact that aggravated robbery could be completed by a mere threat of imminent bodily injury, while the offense of injury to an elderly person required proof of an actual injury. *Id.* The same can be said of Securities Fraud and Theft, in that Securities Fraud can be completed with a mere offer to sell a security, while Theft requires an appropriation of property.

Similarly, in *Cheney v. State*, in comparing the offense of giving a false statement to obtain property or credit (Texas Penal Code Sec. 32.32) and the offense of Theft (Texas Penal Code Section 31.03), the Texas Court of Criminal Appeals found that each Section was distinct in purpose:

> In object or purpose, however, a clear and marked difference exists between the two provisions. Section 32.32, supra, by its own language, proscribes the making of written false or misleading statements to obtain property and credit. It is the act of *making* such statements that is the gravamen of the offense, while actual acquisition of property or credit is not a required element of the offense. On the other hand, the purpose or object of Section 31.03, supra, is to proscribe conduct resulting in the *actual acquisition* of

> property by unlawful means, in this case by false pretext. Seen another way, while both Section 31.03, supra, and Section 32.32, supra, require use of deception under the facts of this case, the deceptive conduct takes different forms.

755 S.W.2d 123, 129 (Tex. Crim. App. 1988). The same rationale applies to this case. As the Court of Criminal Appeals has recognized, the gravamen of the offense of Theft is the proscription of unlawful conduct that results in the actual acquisition of property. *Id.* The offense of Securities Fraud, like the offense of giving a false statement to obtain property or credit in Texas Penal Section 32.32, proscribes fraudulent conduct contained in mere offers to sell a security, with proof of an actual sale not being a required element of the offense. Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-29(C). In contrast to Theft, the "gravamen" of Securities Fraud is the fraud- it is the misrepresentations or failure to disclose material information to others in connection with securities.

Therefore, with the "gravamen" of the offenses of Securities Fraud and Theft being different, along with both offenses requiring different elements, this Court should find that there is no double jeopardy violation for Appellant being convicted and punished for both offenses.

**II. The trial court did not abuse its discretion in denying Appellant's challenge for cause of Juror No. 36 because the Judge properly examined and rehabilitated the juror, and in the alternative, even if the trial court did commit error, the error was not preserved by Appellant's trial counsel who failed to request additional preemptory strikes or even object to Juror No. 36 being impaneled on the jury.**

**A. It was not an abuse of discretion for the trial judge to deny Appellant's challenges for cause of a particular group of venire members that included Juror No. 36 because further examination and clarification by the trial court resulted in the group affirming they could in fact presume Appellant innocent.**

It is within the sound discretion of a trial court to decide whether to strike a venire member for cause when bias or prejudice is not established as a matter of law, and an error is committed only when that discretion has been abused. *Cortez ex rel. Estate of Puentes v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 93 Tex. (2005). Due to the fact that trial judges are present during voir dire, "they are in a better position to evaluate [a] juror's sincerity and his capacity for fairness and impartiality." *Id.* at 93 (*quoting Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex. 1963)).

On appeal, a review of such discretion must take into consideration more than just isolated answers that might favor one litigant or the other; instead, the entire examination must be considered. *Cortez*, 159 S.W.3d at 93 ("[V]eniremembers are not necessarily disqualified when they confess 'bias,' so long as the rest of the record shows that is not the case.") Answers that at first

38

might appear partial or biased can often be the result of inappropriate and confusing questions, and can even be a result of a misunderstanding or ignorance of the law. *Id.* at 92; *see also Mines v. State*, 852 S.W.2d 941, 945 n.7 (Tex. Crim. App. 1992) (*vacated on other grounds*). Thus, further examination or "rehabilitation" of a juror may be warranted to demonstrate a juror's prior confusion or a misunderstanding of the law. *Cortez*, 159 S.W.3d at 92-93.

In this case, Juror No. 36 was never specifically objected to; rather, he was a part of a group of venire members that Appellant's trial counsel had collectively challenged for cause as a result of the group's response to one of his questions during voir dire. Appellant's trial counsel first asked the venire panel if anyone thought his client was guilty simply because he had been indicted by a grand jury, and no juror responded or raised their paddle. (2 R.R. at 94).

Then, Appellant's trial attorney followed up with a different question- "Does anybody feel he must have done something wrong?" and again repeated the question, "Feel that he did something wrong, must have done something wrong." In response to these questions, 17 jurors, including Juror No. 36, raised their paddles. (2 R.R. at 94-95). Later, when the Court was inquiring of any challenges for cause, Appellant's trial counsel challenged the large group of venire members for cause on their inability to adhere to a presumption of innocence. (2 R.R. at 161-162). The trial judge decided to bring the group of venire members in again

for further examination to make sure there had been no confusion. (2 R.R. at 165).

The judge addressed the venire members:

> Thank you for coming in ladies and gentlemen. During the examination Mr. Gilmore asked if any one of you thought that he had done something wrong as a reason for him being here. Remember that question, more or less? I'm sure I didn't get it verbatim. Now, even though you may think that he may have done something wrong, that may not mean that he is guilty of the offense charged. Even if you feel that he may have done something wrong, if you are not convinced that he committed an offense beyond a reasonable doubt, can you find him not guilty if you haven't found that he did not commit an offense beyond a reasonable doubt? Can you still find him not guilty despite the fact that maybe he did something wrong but if it doesn't constitute an offense, you would still be obligated to find him not guilty. Can all of you do that?

(2 R.R. at 165-166). The record indicates that the whole group answered yes. (2 R.R. at 166). At this time, the trial judge allowed further examination of the group. When asked whether the group could presume the Appellant innocent at this stage, Juror No. 36 expressed doubt that he could, saying that, as Appellant identified in his brief, "in my opinion, if a grand jury has indicted him, obviously there is something there." (2 R.R. at 168). Appellant in his brief claims that after this point "the juror was never properly rehabilitated by the judge", yet the record strongly demonstrates that the judge did in fact rehabilitate the juror. (Appellant's Brief at 15).

After Juror No. 36's comments, the trial judge then asked him if he realized that a grand jury indictment was only an accusation, giving an example of when someone has been given a traffic ticket for speeding, stating that at that point, it is still just a charge or accusation of speeding that would still need to be proven in court. (2 R.R. at 168-169). The judge continued, ultimately rehabilitating and clarifying for Juror No. 36:

> THE COURT: All right. So here we are in a more serious charge than a traffic citation. And the way to get a case into district court is by way of indictment. And an indictment is simply an accusation that an offense has been committed. At trial, if the jury feels that it's not convinced beyond a reasonable doubt that the defendant committed the offense, then the jury must find him not guilty. If he presumes him innocent and there's not enough evidence, then the jury finds him not guilty, follow me? Can you do that, sir?
> JUROR NO. 36: Yes, sir.
>
> THE COURT: So you can presume him innocent right now until the State proves guilty beyond a reasonable doubt?
>
> JUROR NO. 36: Yes, sir.

(2 R.R. at 170). Afterwards, when again pressed by Appellant's trial counsel, Juror No. 36 explained that the judge had now clarified things for him, and stated that he could presume Appellant innocent. (2 R.R. at 171). Thus, while Juror No. 36 had initially expressed that he thought the Appellant had done something wrong, and had perhaps initially given too much weight to the fact that there was a grand jury indictment against him, after the judge explained it was only an

accusation, he clearly affirmed that he could presume Appellant innocent until the State had presented enough evidence of guilt beyond a reasonable doubt.

The trial court in this case, in his discretion, determined that these answers were not grounds for this juror, as well as the group of venire members, to be struck for cause, and that the original question the way it had been phrased may have been confusing for the group. (2 R.R. at 171). Thus, it was not an abuse of discretion for the trial judge to overrule Appellant's challenges to this group of venire members. Moreover, the court, upon further clarification and examination, rehabilitated Juror No. 36 to the degree that this Court should find that no error occurred.

**B. In the alternative, assuming that it was error for the trial court to deny Appellant's challenge for cause of the venire member group, Appellant still failed to preserve any error for review by this Court.**

The Texas Supreme Court and the Texas Court of Criminal Appeals have stated that in order to preserve error when a challenge for cause is denied, an appellant must show that he in fact was forced to take an objectionable juror. *Cortez*, 159 S.W.3d at 91; *see also Sifford v. State*, 505 S.W.2d 866, 867 (Tex. Crim. App. 1974) ("Assuming the record shows the prospective juror was subject to challenge for cause, it does not reflect that the appellant requested an additional challenge after he had exhausted all of his peremptory challenges, or that he was forced to take an objectionable juror. No error is shown.")

In order to do so, when an appellant's challenge for cause for a juror has been denied and that particular juror becomes impaneled on the jury, an appellant must show that he had exhausted all his preemptory strikes prior to that juror, that he had requested additional preemptory strikes and, if this request was denied, that he then notified the court that, as a result of the denial, a specific objectionable juror will remain on the jury venire. *Cortez*, 159 S.W.3d at 89-91; *Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004). The rationale behind this is to ensure that "the court is made aware that objectionable jurors will be chosen while there is still time to determine if the party was in fact forced to take objectionable jurors." *Cortez*, 159 S.W.3d at 91 (*quoting Hallet v. Houston Northwest Medical Center*, 689 S.W.2d 888, 890 (Tex. 1985)).

Many Texas courts have not allowed appellants to raise this issue on appeal when they failed to request additional preemptory strikes after they had exhausted all of their strikes. *Adami v. State*, 524 S.W.2d 693, 700 (Tex. Crim. App. 1975) ("[A]s to appellant's contentions concerning jurors Roberson and Woodeal, the record does not reflect that appellant requested additional peremptory challenges to use on these jurors, or that the court would not have given additional challenges if request had been made."); *Weaver v. State*, 652 S.W.2d 420, 423 (Tex. App. – Houston [1st District] 1982) ("Regardless, appellant may not raise this issue on appeal since he did not request an additional peremptory challenge after exhaustion

43

of his original ten challenges to use on a second juror, whose presence he alleged to be objectionable."); *see also Sifford*, 505 S.W.2d at 867.

In this case, before any peremptory strikes were used, Appellant challenged for cause the large group of venire members that included Juror No. 36, and the trial court, after further examination and clarification of the group, denied that challenge. (2 R.R. at 171). After the State and Appellant used all of their respective peremptory strikes, the Judge announced who the panel would be from the remaining venire members that had not been struck, which included Juror No. 36. (2 R.R. at 172). The trial judge, after announcing the panel, asked if there were any objections to the jurors chosen, and Appellant's trial counsel clearly said "No, Your Honor." (2 R.R. at 172).

By failing to give any indication to the judge that there was a juror on the panel that he objected to, he demonstrated to the judge the exact opposite, that there were no objectionable jurors on the panel. Appellant's counsel failed to request additional peremptory strikes at this time, and he failed to object to the juror that he now wishes to challenge on appeal, and as such, he has not preserved any potential error for this Court to review on this issue.

**III. It was not improper for the State's investigator to comment on Appellant's failure to appear pursuant to a subpoena because the Fifth Amendment privilege does not apply to pre-arrest, pre-miranda silence, Appellant never invoked his Fifth Amendment privilege, any potential error caused by the comment was cured by the trial court's instruction to the jury, and in the alternative, the comment was harmless and did not contribute to Appellant's conviction.**

**A. The Fifth Amendment does not protect against comments on Appellant's failure to appear pursuant to a pre-arrest, pre- *Miranda*, administrative subpoena, and thus any comment on the Appellant's failure to do so was not improper.**

The Texas Court of Criminal Appeals has definitively held that "pre-arrest, pre-*Miranda* silence is not protected by the Fifth Amendment right against compelled self-incrimination, and that prosecutors may comment on such silence regardless of whether a defendant testifies." *Salinas v. State*, 369 S.W.3d 176, 179 (Tex. Crim. App. 2012); *see also Morales v. State*, 389 S.W.3d 915 (Tex. App.-- Houston, 2013).

The Court of Criminal Appeals first squarely addressed this issue in 2012 in the case of *Salinas v. State*, 369 S.W.3d 176 (Tex. Crim. App. 2012). In that case the defendant, at the request of police officers, voluntarily accompanied them to the police station for questioning. *Id.* at 177. The defendant answered every question that was posed to him, until he was asked a question about whether certain shotgun shells found at a crime scene would match a shotgun found at his home. The defendant in response to this question remained silent. *Id.* At trial, the State was allowed to introduce evidence of the defendant's silence in response to

this question over the objection of counsel; the defendant did not testify at trial, and was convicted. *Id.*

In appealing this conviction, it was argued that the State could not introduce evidence of his silence because he could invoke his right to remain silent whether or not he was in custody. The Texas Criminal Court of Appeals disagreed, ultimately observing "[i]n pre-arrest, pre-*Miranda* circumstances, a suspect's interaction with police officers is not compelled. Thus, the Fifth Amendment right against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak." *Id.* at 179.

In this case, Appellant seeks the protection of the Fifth Amendment from comments on his failure to respond to an administrative subpoena, though as the record indicates, Appellant eventually did submit to an interview with the State's investigator and produce records that were in response to those requested in the subpoena. (4 R.R. at 43, 49, 58-63). Appellant received this subpoena prior to his interview with the State's investigator which took place in July of 2013. (4 R.R. at 43, 49). He was indicted in September of 2013, and subsequently arrested. (1 C.R. [653] at 6-7, 9; 1 C.R. [654] at 6-8, 10). Thus, Appellant was in a "pre-arrest, pre-*Miranda*" circumstance when he received the Texas State Securities Board subpoena. It therefore follows that Appellant's silence or failure to respond to an

administrative subpoena is not protected by the Fifth Amendment and the State may comment on such absence or "silence."

**B. Appellant failed to affirmatively invoke his Fifth Amendment privilege when he initially failed to appear pursuant to an administrative subpoena, barring Appellant from claiming any of its protections.**

Appellant asserts that the State violated his Fifth Amendment right when its investigator commented on the fact that, prior to him voluntarily coming in to be interviewed by the investigator, he had failed to appear pursuant to a subpoena he received from the Texas State Securities Board. (Appellant's Brief at 15-16). There is no evidence from the record, including Appellant's direct examination testimony, to indicate that Appellant's initial failure to appear was the result of his invocation of a Fifth Amendment privilege. Given that the Fifth Amendment privilege is not ordinarily self-executing, Appellant's failure to invoke this privilege prevents him from asserting its protection over his initial failure to act in response to a subpoena.

The Fifth Amendment privilege against compelled self-incrimination is not self-executing, but is a privilege that ordinarily must be invoked. *United States v. Monia*, 317 U.S. 424, 427 (1943) ("[t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the

meaning of the Amendment."); *Garner v. United States*, 424 U.S. 648, 655 (1976) ("Unless a witness objects, a government ordinarily may assume that its compulsory processes are not eliciting testimony that he deems to be incriminating. Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege."); *Roberts v. United States*, 445 U.S. 552, 559 (1980) ("[P]etitioner did not assert his privilege or in any manner suggest that he withheld his testimony because there was any ground for fear of self-incrimination."); *Minnesota v. Murphy*, 465 U.S. 420, 428 (1984) ("[N]othing in our prior cases suggests that the incriminating nature of a question, by itself, excuses a timely assertion of the privilege."); *Johnson v. State*, 357 S.W.3d 653 (Tex. Crim. App. 2012) ("To seek the protection of the Fifth Amendment, a defendant in a criminal case normally must affirmatively assert the privilege.").

An exception to this rule is when an individual is subjected to custodial interrogation in which the setting contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Murphy*, 465 U.S. at 430 (*citing Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). Thus, the safeguard requirements of a *Miranda* warning, and an exception to the rule that an individual must affirmatively assert the privilege, are only applicable within the context of an

inherently coercive custodial interrogation. *Id.* at 430 (*citing Roberts v. United States*, 445 U.S. 552, 560 (1980)). Merely being required by the Government to appear to give testimony and speak truthfully is not considered an inherently compelling pressure that rises to the level of a custodial interrogation where an individual is not required to assert his Fifth Amendment privileges. *Id.* at 427.

In *Murphy*, the United States Supreme Court found that a defendant who was on probation and under a court order to periodically meet with his probation officer, and speak truthfully to that officer, was not compelled into giving incriminating statements that he gave in response to the probation officer's questions about his possible involvement with a previous offense. *Id.* at 432-434. In that case, the Supreme Court found that the defendant should have asserted his Fifth Amendment right, and the circumstances of being under a court order to meet with his probation officer was not enough to give rise to a coercive situation in which he didn't need to affirmatively assert the privilege. *Id.* This was true even though his refusal to meet with his probation officer may have resulted in future confinement. *Id.* The *Murphy* court specifically compared the defendant's situation to that of a person who is required to appear and give testimony pursuant to a subpoena, stating:

> [T]he general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury

49

> who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, *unless he invokes the privilege* and shows that he faces a realistic threat of self- incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer *over his valid claim of the privilege*. This much is reasonably clear from our cases.

*Id.* at 427 (emphasis added). In this case, Appellant is claiming the protection of his Fifth Amendment right against self-incrimination, and therefore to remain silent, in response to an administrative subpoena. Appellant necessarily, in asserting that this right was violated when the investigator commented on his initial failure to appear pursuant to the subpoena, must rely on the notion that he did not need to affirmatively invoke the privilege, since there is no evidence in the record whatsoever that Appellant did so.

What also must follow is that the subpoena request in and of itself must have given rise to certain circumstances that allow Appellant to claim the Fifth Amendment's protections without its invocation, a line of reasoning that was squarely rejected by the Supreme Court's holding in *Murphy*. *Murphy's* holding was clear that the obligation to appear and give testimony under a subpoena is not a coercive circumstance from which an individual is relieved of the requirement to affirmatively invoke their Fifth Amendment privilege if they wish to rely upon its protections later. *Murphy*, 465 U.S. at 435. ("A state may require a probationer to

appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege.")

Furthermore, it is also important to note that even if Appellant had invoked this privilege at this point in time, Appellant may very well have waived the privilege when he later did appear at the Texas State Securities Board's headquarters and spoke with the State's investigator. (4 R.R. at 49). The State's investigator testified that the subpoena had requested testimony from the Appellant in relation to Mays Financial Group, and requested him to produce documents in relation to Mays Financial Group. (4 R.R. at 43). According to the investigator's testimony, he and the Appellant discussed Mays Financial Group at length and the Appellant even produced documentation in relation to Mays Financial Group that he gave the investigator. (4 R.R. at 49, 58-63).

There is nothing from the record that indicates that Appellant ever affirmatively invoked his Fifth Amendment right when he chose to initially not appear in response to the TSSB's subpoena, and as such, he is barred from claiming that this right was violated by the state investigator's comments. Moreover, the fact that Appellant later voluntarily came in and discussed topics and produced records that were the same as those requested in the subpoena, indicates that Appellant's initial failure was not an exercise of his Fifth

Amendment right, and even if it was, his later appearance waived any privilege that Appellant claims was violated.

### C. Even if this Court were to find that the comment on Appellant's initial failure to appear pursuant to a subpoena was improper, the trial court's instruction to the jury to disregard the comment was enough to cure the error.

An instruction to disregard a particular comment is presumed to cure the harm. *Wesbrook v. State,* 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001). It is also presumed that a jury will follow a court's instructions to disregard a particular comment. *Id.* at 116; *see also Weatherby v. State*, 61 S.W.3d 733, 738 (Tex. App.—Fort Worth, 2001).

Thus, except in extreme cases, when a trial court is prompt in instructing a jury to disregard a particular comment, it cures any error caused by the comment, and as a result, a trial court does not commit error in denying a mistrial. *E.g., Bower v. State*, 769 S.W.2d 887, 907 (Tex. Crim. App. 1989) ("We agree that the argument made by the prosecutor was a comment on the defendant's failure to testify. However, we believe that the error was cured by the court's sustaining of appellant's objection and the instruction to disregard."); *Moody v. State,* 827 S.W.2d 875, 890 (Tex. Crim. App. 1992) ("We find that any potential error in the witness's mentioning of an arrest jacket was cured by the trial court's instruction to disregard; thus there was no error in denying the motion for mistrial."); *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) ("[W]e agree with appellant

that this testimony constituted a comment on appellant's post-arrest silence and was therefore inadmissible. However, this does not lead to an automatic reversal.

In the instant case, the trial judge sustained appellant's objection and instructed the jury to disregard Hobbs' testimony.  Therefore, we find the error was cured."); *see also Weatherby*, 61 S.W.3d at 738 ("In light of the trial court's prompt instruction to the jury to disregard the comment and appellant's failure to rebut the presumption that the instruction cured the harm, we hold the trial court did not err by denying his motion for mistrial.").  These cases illustrate that an instruction to disregard, like the instruction by the trial court in this case, is enough to cure any error from improper comments.

In this case, the comment in front of the jury that Appellant challenges is in the following exchange between the State's prosecutor and the State's investigator:

Q: Did the State Securities Board issue a subpoena to the defendant?

A: Yes, ma'am.

Q: What did that subpoena require?

A: The subpoena was a request for two things: For Mr. Mays to come in and provide testimony related to Mays Financial Group and   for Mr. Mays to provide documents in his possession related to       Mays Financial Group.

Q:  To your knowledge, did the defendant appear to give testimony pursuant to the subpoena?

A: No, he didn't.

Q: Did he eventually come in for an interview?

A: Yes, ma'am, he did.

(4 R.R. at 42-43). Appellant's trial counsel after this exchange objected to any comment on Appellant's failure to appear. (4 R.R. at 45). They also requested a jury instruction to disregard the comment and moved for a mistrial. (4 R.R. at 46-47). The trial court denied the motion for a mistrial. (4 R.R. at 47). It then instructed the jury with the following:

> THE COURT: Members of the jury, you will remember that when I gave you instructions at the time of jury selection, that I told you about the right of a person to not testify at his trial. That right is based on the Constitution of the United States and the Constitution of Texas and the laws of the State of Texas. The right not to testify extends not only during the course of the trial, but also to events outside of the courtroom. And I am sure you are familiar with those TV programs where you see an officer advising a person of his rights, of his Miranda rights, if you will. So the right extends to events and places outside of the courtroom; and a person may refuse to talk to police officers to give them a statement or for other purposes; and a person may even, if he shows up at that point, decline to say anything to a police officer. So the right to not visit with the police officer or an agent of the State is also included within the fifth amendment privilege that a person has.

(4 R.R. at 47-48). The trial court went on to instruct the jury further:

> THE COURT: And, members of the jury, in that regard, I will instruct you to disregard any testimony offered by the witness either in response to a question or what was stated in a question, that the defendant did not appear at the office of this officer in response to the subpoena.

54

(4 R.R. at 48-49). Irrespective of whether the comment was improper or not, the trial court in this case promptly gave instructions to the jury to disregard any comment by the state's investigator that alluded to the fact that Appellant did not initially appear pursuant to the subpoena. This instruction, as it was found in *Moody*, *Dinkins*, *Bowers*, and *Weatherby*, was enough to cure any error from the comment. Particularly since the duration of the testimony that proceeded after the instruction was about when the Appellant decided to not remain silent, and instead decided to appear and speak with the State's investigator. (4 R.R. at 49, 58-63). Furthermore, the jury heard testimony from the Appellant himself both at the guilt/innocence phase and the punishment phase of the trial. (5 R.R. at 38-106, 6 R.R. at 41-54).

This isolated comment, if this Court were to find it to be improper, was cured by the trial court's prompt and direct instructions to the jury to disregard, and as such, the trial court committed no error in denying Appellant's request for a mistrial.

**D. In the alternative, assuming the State's comment was improper and the trial court's instruction was not enough to cure the error, this Court should find beyond a reasonable doubt that the comment was harmless in that it did not contribute to Appellant's conviction.**

Only when a reviewing court has determined that an instruction to disregard was ineffective to cure an error, does a reviewing court go on to determine the harm, if any, from the comment and its impact on a jury's verdict. Tex. R. App. P.

44.2; *see Weatherby*, 61 S.W.3d at 737. If this Court were to find, beyond a reasonable doubt, that the comment challenged by Appellant did not contribute to the verdict, then the comment is deemed harmless, and does not warrant a reversal. *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) ("If we find, beyond a reasonable doubt, that a constitutional error did not contribute to the verdict, then the error was harmless such that we will not reverse the judgment.") *see also Brecht v. Abrahamson*, 507 U.S. 619 (1993) ("Our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes of petitioner's post-*Miranda* silence had substantial and injurious effect or influence in determining the jury's verdict.").

To make this determination, this Court must "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Neal*, 256 S.W.3d at 284. The Texas Criminal Appeals Court, in interpreting Texas Rules of Appellate Procedure 44.2(a), has stated "[t]he harmless-error inquiry under Rule 44.2(a) should adhere strictly to the question of whether the error committed in a particular case contributed to the verdict *in that case*." *Snowden v. State*, 353 S.W.3d 815, 821 (Tex. Crim. App. 2011). In this case, the evidence against Appellant was overwhelming, and the isolated reference about the Appellant's decision to initially not appear pursuant to a subpoena did

not affect, persuade, or prejudice the jury in its fact-finding function and its ultimate verdict.

Several cases illustrate the weight and impact that courts are to give to certain isolated comments and other constitutional errors under this harm analysis. In *Neal v. State*, the Texas Court of Criminal Appeals addressed the issue on appeal of whether evidence seized from a motel room, which had been found to be inadmissible, had contributed to the jury's guilty verdict. The Texas Court of Criminal Appeals found the evidence had not contributed to the jury verdict, and thus rendered the error harmless. 256 S.W.3d at 284. In arriving at its decision, the Criminal Court of Appeals observed that the evidence from the motel room and the way it was presented at trial was just "adding one more vivid detail to the much larger story of the events surrounding the murder…" and observed that the evidence "was not essential to the State's case." *Id.* The Court also attributed its decision to the fact that the State had presented overwhelming evidence of the appellant's guilt outside of the evidence obtained from the motel room. *Id.*

Similar to *Neal*, in the case of *Snowden v. State*, the Texas Court of Criminal Appeals was reviewing the issue of whether the State's prosecutor had improperly commented on the appellant's failure to testify at trial, and whether such comments contributed to the guilty verdict. 353 S.W.3d 815 (Tex. Crim. App. 2011). Finding that the trial court erred in not sustaining the original objection to the

prosecutor's comment, the Texas Court of Criminal Appeals nevertheless found that the comment itself was harmless and had not contributed to the verdict. *Id.* at 826.

The *Snowden* Court arrived at its decision by pointing out that "[t]his error was isolated" and that it "was never repeated or emphasized." *Id.* at 825. It also observed that "[t]he evidence against the appellant was substantial, if not overwhelming", noting that the case would come down to whether or not the jury had found the victim credible, with the Court reasoning that if the jury did not believe the victim, any reference to the appellant's failure to testify would not have mattered. *Id.* The Court ultimately concluded, "the precise error in this case, in our view, did not move the jury from a state of non-persuasion to a state of persuasion on any material issue in the case, nor is it reasonably likely to have caused such prejudice as to distract the jury or divert it from its proper fact-finding role." *Id.*

In this case, the reference to Appellant's initial failure to appear pursuant to a subpoena was an isolated comment. (4 R.R. at 43). After the judge instructed the jury to disregard it, the State never repeated or emphasized it. Furthermore, unlike *Snowden* in which the appellant in that case never took the stand at trial, the jury in this case not only got to hear testimony from the State's investigator about conversations he had with Appellant, but they also got to hear from Appellant himself both at the guilt/innocence stage of the trial, and at punishment. As the

Texas Court of Criminal Appeals reasoned in *Snowden*, much of the jury's decision could have come down to whether or not they found Appellant's own testimony credible, and regardless if they did or did not, the fact that he on an earlier occasion, before speaking to the State's investigator, decided not to appear pursuant to an administrative subpoena, would not have had significance in their verdict.

Furthermore, like the Court of Criminal Appeals found in *Neal* and *Snowden*, the evidence presented by the State against Appellant in this case is overwhelming. The jury heard testimony from victims such as Kathleen Trial who testified that Appellant had represented to her and her husband that their investment of $25,000 would be invested in commodities, particularly gold and silver. (3 R.R. at 31-32). The jury also heard from Diane Lechuga that the Appellant initially represented that her investment of $25,000, which she testified she obtained at the Appellant's recommendation by borrowing against her 401K, would be used to invest in small businesses and later possibly traded in commodities. (4 R.R. at 10-11, 14, 27-28). They also heard from Judson Hall and Stephen Morris that Appellant represented to them that their investments would be invested in stocks and commodities. (4 R.R. at 131, 134, 164).

The jury then was shown, through the testimony of the State's witness Eliza Lujan, a financial examiner for the Texas State Securities Board, that each victim's

funds had not been used in the manner that was represented to them by Appellant. Having reviewed bank accounts belonging to the Appellant, Ms. Lujan testified that the victims' funds were instead used for personal expenses such as rent, utilities, house cleaning for his personal residence, credit card payments, loan payments, cash withdrawals, payments on past judgments obtained against him, restaurants, groceries, child support, and payments to others that had also invested with him. (4 R.R. at 91-92, 96, 99-102).

The State also presented evidence through Ms. Lujan and Mr. Sabban, the State's investigator, that Appellant, prior to and while he was approaching many of the victims to invest with him, was having significant financial difficulties. Ms. Lujan testified that the balance of Appellant's bank accounts, prior to receiving the victims' funds was extremely low, sometimes reflecting a negative balance, with some victims' investments being spent in as little as a month's time. (4 R.R. at 90, 92-93, 99, 100-101, 103).

The jury heard evidence from Ms. Lujan that suggested that at the time of Diane Lechuga's investment, who was the first investor, Appellant was three months behind on his rent for a home he was renting in Corpus Christi. (4 R.R. at 91:5-17). Specifically, Ms. Lujan testified seeing a check written in March for $3,589.50, to Appellant's landlord with the notation of "Jan., Feb., Mar." (Id.). Ms. Lujan testified that the funds out of which the check was drawn had originated

from Ms. Lechuga's investment funds. (7 R.R. "Exhibit Volume" [9] at State's Ex. 15).

The State further presented evidence of a tax lien against Appellant in the amount of $42,924.56, a divorce decree ordering Appellant to make $1100 per month in child support payments, a lawsuit for unpaid credit card debt, loan documents showing that the assets of Mays Financial had been pledged, and a judgment in excess of $20,000 for unpaid rent from a landlord in Austin, Texas. (7 R.R. "Exhibit Volume" at State's Ex. 6, 7, 8, 9, 10, 11). The jury heard the victims testify that Appellant had never disclosed these financial troubles to them prior to their investments. (3 R.R. at 47-48; 4 R.R. at 17-19, 135-136, 155, 167-170). Even Appellant himself, on cross-examination admitted that he did not disclose to the victims some of his and his company's financial problems, or the fact that he was planning on using some of their funds for personal expenses. (5 R.R. at 96-98).

Given the overwhelming amount of evidence the State introduced against Appellant, and that the comment by the State's investigator was isolated and neither repeated nor emphasized, this Court should find the comment harmless, and that the trial court did not commit error in denying Appellant a mistrial.

---

[9] The "Exhibit Volume" of the reporter's record is captioned "Volume 7 of 7 Volumes."

**IV. The trial court properly admitted evidence identifying Jerry and Marianne Sevier as investors in Appellant's program to allow the State to demonstrate how Appellant had used funds belonging to victims listed in the indictment, to make payments to the Seviers; such evidence is not extraneous evidence of bad acts, but in the alternative, even if it was, it was still proper because same transaction contextual evidence is admissible.**

**A. Evidence identifying Jerry and Marianne Sevier as investors in Appellant's program was not extraneous evidence of bad acts against the Seviers, but instead established that investors in his program had received portions of funds belonging to the victims who remained in the indictment.**

In Appellant's fourth issue, he asserts that the trial court erred in allowing testimony and evidence over the objection of his defense counsel, regarding parties that were struck from the indictment before trial. (Appellant's Brief at 17-19).

A trial court's ruling on the admissibility of evidence, including those alleged to be extraneous offenses, is reviewed under an abuse of discretion standard. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005); *see also Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Prible*, 175 S.W.3d at 731; *Santellan*, 939 S.W.2d at 169.

During trial, the prosecution presented evidence through the testimony of Investigator Rani Sabban that included statements the Appellant made and documents the Appellant produced to Investigator Sabban during an interview that took place in July 2013. (4 R.R. at 49, 59-63). Specifically, the State introduced

62

what was admitted into evidence as State's Exhibits 13 and 14, documents the Appellant gave to Investigator Sabban regarding Jerry and Marianne Sevier. (4 R.R. at 59; 7 R.R. at State's Ex. 13, 14). Defense counsel objected and a bench conference followed. (4 R.R. at 50-58).

The State indicated that the evidence was being offered to show that the Defendant turned over the records and acknowledged that Jerry and Marianne Sevier were investors in his program. (4 R.R. at 50). Furthermore, the State explained that they planned to show that the some of the victims in the indictment who had invested after the Seviers, had portions of their funds used to make ponzi payments to the Sevier's. (4 R.R. at 56). Although the Seviers were no longer in the indictment at the time of trial, the State still had the burden to demonstrate what happened to each of the funds belonging to the victims who remained in the indictment, and the State indicated that some of the victims remaining in the indictment had their funds used to pay the Seviers. (4 R.R. at 56). It was thus necessary for the State to provide evidence of who the Seviers were in relation to Appellant. The State indicated that the evidence ultimately "goes to show that there was a continuing scheme and course of conduct" in that Appellant, when making what he claimed were "monthly interest payments" to his investors, was regularly using victim's funds to pay earlier investors (4 R.R. at 53). The State simply sought to show that the Seviers were earlier investors.

The evidence admitted as State's Exhibits 13 and 14 therefore did not constitute extraneous or bad acts against the Seviers. State's Exhibit 13 and 14, along with the testimony elicited from Investigator Sabban regarding those exhibits, solely served the purpose of identifying for the jury the individuals who had received other victims' money, and that these individuals were also investors in Appellant's program. The identity of who the Seviers were would come into question during later testimony that the State offered through its financial examiner, Ms. Lujan, who had traced and testified to how the funds of those listed in the indictment were used. (4 R.R. at 50:8-20, 51, 56, 100; 7 R.R. at State's Ex. 18). For example, in State's Exhibit 18, Ms. Lujan had listed a $1500 payment out of the funds that had been invested by Kathleen Trial, one of the victims in the indictment, was paid to the Seviers. (7 R.R. at State's Ex. 18; 4 R.R. at 100).

It is important to note that after introducing State's Exhibits 13 and 14, only one question was asked of Investigator Sabban regarding the Sevier's.

Q:     Did the defendant tell you who Marianne and Jerry Sevier
       were?

A:     Yes, ma'am. He just identified them as investors with Mays
       Financial Group.

(4 R.R. at 60). There was no additional testimony elicited from Investigator Sabban or the State's financial examiner about how the funds specifically invested

by Jerry and Marianne Sevier were used or whether they had been victims of securities fraud, whatsoever.

While the State's financial examiner could testify as to individual names she identified in the Appellant's bank accounts who were receiving victims' funds, she could not testify with any personal knowledge who those individuals were or how they were connected with Appellant. Appellant's statements to the State's investigator demonstrated that victims' funds were going to individuals, who the Appellant himself acknowledged, were investors in his program. This is the quintessential definition of a Ponzi scheme, using later investors' funds to make payments to earlier investors. (4 R.R. at 234); Wells, Joseph T., "Ponzi Scheme", Encyclopedia of Fraud (3d ed. 2007).

The copies of the Appellant's promissory notes to the Seviers, and the admission by Appellant that the Seviers were investors in his program, do not constitute evidence of bad acts because that testimony and those promissory notes do not suggest any wrong doing by Appellant to the Seviers. The State, however, had every right to produce evidence in showing Appellant's wrongdoing to the other victims' in the indictment, including when Appellant used victims' funds to pay other investors (the Seviers) in his program. Thus, the trial court did not error in allowing the State to admit this evidence during trial.

65

**B.** **In the alternative, assuming that the evidence was extraneous evidence of bad acts, the trial court still did not commit error in its admittance because this evidence was contextual, within the same transactions that were occurring during Appellant's scheme and continuing course of conduct.**

Even assuming the evidence admitted at trial regarding the Sevier's was evidence of extraneous "bad acts", it was still properly admitted within the discretion of the trial court as it was relevant as contextual, same transaction evidence. While such evidence is not permitted "to prove the character of a person in order to show that he acted in conformity therewith," the State did not introduce such evidence to highlight Appellant's character. Tex. R. Evid. 404(b). The promissory notes turned over by Appellant to Investigator Sabban, and his statements identifying the Seviers as investors in his program, were not, in and of themselves, evidence of any wrongdoing, and thus could not produce a negative inference on Appellant's character that he had in some way also victimized the Seviers.

Texas Rule of Evidence 404(b) does, however, allow evidence of extraneous misconduct to be admitted as long as the evidence serves another purpose under the rule. *Montgomery v. State*, 810 S.W.2d 372, 394 (Tex. Crim. App. 1991); Tex. R. Evid. 404(b). Specifically, Rule 404(b) recognizes that such evidence may be "admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b).

In interpreting this rule, the Texas Court of Criminal Appeals has also recognized that same transaction contextual evidence may also be admissible where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony … of any one of them cannot be given without showing the others." *Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011); *Wyatt v. State,* 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (*quoting Rogers v. State,* 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). The Court of Criminal Appeals has reasoned that the admissibility of such evidence stems from the fact that "it has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Wyatt*, 23 S.W.3d at 25 (*quoting Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986).

In *Devoe*, the appellant was convicted of capital murder for the intentional murder of two individuals during the same criminal transaction. *Devoe*, 354 S.W.3d at 461. The appellant in that case claimed that it was error that the trial court allowed him "to be tried on copious amounts of extraneous offense evidence" during the guilt/innocence phase of trial, in violation of Rule 404(b). *Id.* at 469. The appellant in *Devoe* had complained that the trial court allowed the State to

present extraneous offense evidence pertaining to "the theft of Brinlee's gun, the aggravated assault of Wilson in Llano, the killing of Allred in Marble Falls, and the robbery of DeHart in Pennsylvania." *Id.* at 469. The State in that case had argued that each of the extraneous offenses, beginning with the burglary and theft of Brinlee's gun, and ending with the robbery of DeHart, constituted one continuous episode because those extraneous offenses were necessary to properly explain what happened and clarify the nature of the crime alleged. *Id.* at 469-470. The Texas Court of Criminal Appeals agreed with the State and with the lower trial court's ruling that had concluded:

> The evidence is so intermingled between all of the events that occurred it would just—it would be impossible to do so without leaving a hole, a gaping hole in the State's case. So, the Court does find that this is one continuing course of conduct.

*Id.* at 470. In the present case, the State also argued that the evidence identifying the Seviers as investors was necessary in order for the State to be able to prove that "investor funds had been used for purposes other than those intended" and that "investor funds had not been used as promised", as alleged in the indictment. (4 R.R. at 50, 53, 55; 1 C.R. [654] at 7.)

Appellant cites *Templin v. State*, to support his claim that "a Defendant is entitled to be tried on the accusation in the state's pleading and not for a collateral crime or for being a criminal generally." 711 S.W.2d 30, 31 (Tex. Crim. App. 1986); (Appellant's Brief at 18). Appellant further states that "in *Templin*, the

Texas Court of Criminal Appeals held that it was reversible error to introduce evidence that the defendant had taken illicit mind-altering substances so therefore he had taken them at that point." (Appellant's Brief at 18). Appellant incorrectly states the facts of this case, as there was no discussion of "mind-altering substances" in the *Templin* case. In *Templin*, the Appellant, who was approximately 27 years old at the time of trial, was accused of murdering his wife by electrocution. *Id.* at 32. The trial court allowed testimony from two of Appellant's second cousins who testified that when appellant was ten or twelve years old, appellant told them that he had electrocuted dogs and cats. *Id.* at 31.

On appeal, the Court of Criminal Appeals found that the appellant's admissions to his relatives regarding prior execution of animals was in fact relevant to material elements of the State's theory of the case, however, the Court held that the prejudicial and inflammatory nature of the evidence was so great that it outweighed its probative value. *Id.* at 33-34. The Court's holding notably took into consideration the remoteness of the prior conduct, which was 10-12 years earlier when the appellant was a child, and pointed to the fact that the State had used the extraneous transaction evidence during final argument that had an inflammatory effect. *Id.* at 34-35.

Contrary to Appellant's assertion that *Templin* is comparable to this case, the record in this case is devoid of any inflammatory evidence concerning the

Seviers, as the State never introduced evidence or a chart, as it did with the victims that remained in the indictment, to show how the Seviers' investment funds were used. Without such evidence, along with no testimony from the Seviers, there was no evidence of how the Seviers' funds were used, let alone if their funds were used in a manner that was inconsistent with their consent.

Furthermore, the payments to the Seviers with the victims' money in this case all occurred during and between the alleged dates of the scheme that the State identified in its indictment against Appellant, making such payments contextual same-transaction evidence, which is admissible. (7 R.R. at State's Ex. 18; 1 C.R. [654] at 6-7). Thus, there was no issue of remoteness as in the *Devoe* case, since the payments were taking place during the same scheme and course of conduct that the State was alleging Appellant to have committed against the victims who remained in the indictment. *Templin* is not only distinguishable from this case, but stands in stark contrast to the type of extraneous offenses that were at issue in that case, compared to the evidence at issue in this case, which is arguably not even extraneous.

The evidence admitted at trial in regards to the Seviers was not evidence of an extraneous act, but merely evidence used by the State to demonstrate how each victim's funds were used, including to whom they were given. Yet even if this Court were to find that such evidence was extraneous, the Court was within its

discretion to allow such evidence as it was relevant contextual, same transaction evidence. The trial court thus did not error in admitting the limited evidence the State introduced that identified the Seviers as investors in Appellant's program.

**V. The Trial Court did not abuse its discretion in allowing testimony from the State's Securities Regulatory Expert that aided the jury in its understanding of an incredibly complex industry and gave an opinion on how certain facts in evidence measured up to certain terminologies within the industry.**

In Appellant's fifth point, he challenges the trial court's decision to allow testimony from the State's Securities Regulatory Expert, Travis Iles, claiming his opinions were "conclusory, implied legal conclusions, and cumulative." (Appellant Brief's at 19). Appellant specifically argues that the trial court abused its discretion by failing to satisfy all three of the conditions espoused in *Alvarado v. State*:

> (1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is an appropriate one for expert testimony; and (3) that admitting the expert testimony will actually assist the factfinder in deciding the case.

912 S.W.2d 199, 215-216 (Tex. Crim. App. 1995); (Appellant Brief at 19-20).[10]

The decision whether to allow a witness to testify as an expert is committed to the sound discretion of the trial court. *Pierce v. State,* 777 S.W.2d 399 (Tex. Crim. App. 1989) Thus, the standard of review for a trial court's ruling regarding the admissibility of expert testimony is an abuse of discretion. *Lagrone v. State*,

---

[10] After referencing the three conditions in *Alvarado*, Appellant stated "this witness's testimony raises all three questions."

942 S.W.2d 602, 616 (Tex. Crim. App. 1997). An abuse of discretion occurs only when such a ruling is found to be "so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992). This is true despite the fact that this Court, in the same circumstances, may have ruled differently or if the trial court committed a mere error in judgment. *E.I. du Pont de Nemours and Company, Inc. v. C.R. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

In this case, the trial court did not abuse its discretion in allowing the State's expert, Travis Iles, to testify because Mr. Iles' extensive background and experience in securities regulation allowed him to aid the jury in explaining complexities of the industry and how certain facts and exhibits in evidence measured up to certain terminology used within the industry.

**A. The State's expert witness gave opinions on issues that are mixed questions of law and fact, which are appropriate for expert testimony.**

Appellant was convicted of first degree securities fraud under the Texas Securities Act, in which it is a felony to engage in any fraud or fraudulent practice in connection with the sale, offering for sale, or purchase of any security. Tex. Rev. Civ. Stat. Ann. Art. 581–29(C) (West 2010 and Supp. 2014). The Texas Securities Act defines "fraud" or "fraudulent practice" to include "an intentional failure to disclose a material fact." Id. at art. 581-4(F). The State used its securities

regulatory expert, Travis Iles, of the Texas State Securities Board, to give his opinion on whether certain transactions in the case were securities and whether certain facts in evidence were "material" facts.

Appellant challenges the trial court's discretion in admitting Mr. Iles' testimony on the grounds that his opinions were "conclusory and implied legal conclusions." (Appellant Brief's at 19). Specifically, Appellant refers to Mr. Iles' testimony explaining securities and materiality, and his opinions on whether the transactions in the case and that facts in evidence measured up to these industry standards, asserting that these issues were inappropriate for expert testimony. Id. at 19-20.

Yet, expert opinion testimony has been found appropriate on questions of mixed law and fact, and often necessarily involve the identification of a legal standard under which an expert will give his or her opinion. In this case, Mr. Iles gave his opinions, based upon the testimony and the evidence admitted at trial, on whether certain transactions between the victims and the Appellant were "securities", and whether certain facts in evidence were "material." Both the questions of whether a security exists and whether facts are material have been held as questions of mixed law and fact. Thus, the opinions of the State's securities regulatory expert were appropriate and the trial court did not abuse its discretion in allowing his testimony.

## 1. **Opinions addressing mixed questions of law and fact are appropriate for expert testimony.**

While expert witnesses may not testify on pure questions of law, it is well settled that expert testimony can be appropriate in cases in which the opinion offered is on a mixed question of law and fact.[11] This is so even if such opinions encompass an ultimate issue or fact in the case.  Tex. R. Crim. Evid. 704.  *See also Duckett v. State*, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990).   Some Courts have gone on further to describe the types of issues that are considered mixed questions of law and fact:

> An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard.

*Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 134 (Tex. App.---Texarkana 1994, *no writ*).[12]

---

[11] *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 365 (Tex.1987) ("Fairness and efficiency dictate that an expert may state an opinion on a mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts."); *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007), *ref. Birchfield* ("[A]n expert may state an opinion on mixed questions of law and fact, such as whether certain conduct was negligent or proximately caused injury, that would be off limits to the ordinary witness."); *Templeton v. Dreiss*, 961 S.W.2d 645, 673 (Tex. App.---San Antonio 1998) ("The general rule is that expert opinion is not usually admissible on a question of law…But where the words or phrases are technical and aid is needed in their interpretation there is no prohibition against the use of expert opinion testimony.") *Holden v. Widenfeller*, 929 S.W.2d 124, 133 (Tex. App.---San Antonio 1996, *pet. denied*) ; *Welder v. Welder*, 794 S.W.2d 420, 432 (Tex. App.---Corpus Christi 1990).

[12] *See also Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.---Houston [14th District] 2000), *aff'd* 145 S.W.3d 170 (Tex. 2004); *Digges v. State*, No. 05-10-00239-CR, 2012 WL 2444543, at 7 (Tex. App.---Dallas June 28, 2012) (mem. op., not designated for publication).

In *Crum*, the appellants were insurance companies appealing from an adverse judgment that found them liable for "wrongfully obtaining and manipulating a financial interest" in a particular prior insurance litigation. 887 S.W.2d at 113. The Texarkana Court of Appeals aptly described the complex case in its opinion as "litigation about litigation." *Id.* The insurance companies on appeal had challenged the lower court's decision to allow the appellee's expert witness to give an opinion regarding the propriety of certain agreements that were at issue, arguing it had erroneously admitted legal conclusions from the expert. *Id.* at 115.

The appellee's expert witness in *Crum* had given testimony that in his opinion, certain agreements that were in evidence "were illegal and against Texas public policy." *Id.* at 133. The opinion further states that the expert testified that at the time the agreements were entered into, and in the manner they were entered into, the agreements were "against the public policy of the State of Texas as pronounced by our Supreme Court." *Id.* at 133-134. The expert witness even cited specific caselaw to support his opinion during his testimony. *Id.* Yet the Court of Appeals, particularly in light of the complexity of the law and subject matter of the case, found that the lower court had not abused its discretion in allowing the expert's testimony, finding that the expert's opinion was on a mixed question of law and fact:

To the extent that the witness discussed both the law and its application in the factual context of the case on trial, the testimony involved a mixed question of law and fact. Most of Parsons's testimony pertained to the facts of the case, but his testimony is sprinkled with legal ramifications. As we previously stated, this is a case about litigation, and it would be impossible to discuss the case without bringing in legal principles. For example, he explained the term *subrogation* to the jury. The defining of this term is in a sense legal, but at the same time it is also an insurance term and the definition was helpful to the jury in understanding the testimony… The appellants also complain about the explanation of the legal meaning of a Mary Carter agreement. To the extent that the legal principles involving a Mary Carter agreement were applied to the facts in this case, this constitutes a question of mixed law and fact.

*Id.* The appellants' claims in *Crum* in many respects mirror those of Appellant's in this case. Appellant, in support of his claim that Mr. Iles impermissibly testified to a legal conclusion, points to the fact that Mr. Iles explained the terms "security" and "materiality" before he shared his opinions. (Appellant's Brief at 19). Yet this line of reasoning suggests that while experts can testify and opine on how certain facts measure up to certain legal standards, they must do so without alluding to or explaining the legal standard whatsoever.

To allow no reference to a legal standard when an expert is opining on an issue that is a mixed question of law and fact would effectively prevent an expert witness in explaining his methodology in reaching his opinion on how a particular set of facts or evidence meets a legal standard. Furthermore, the *Crum* court recognized that the term "subrogation", though legal in nature, was also a term in the insurance industry, the explanation of which aided the jury in its understanding

of the insurance industry and how the expert reached his opinion.  Likewise, in this case, the terms "security" and "materiality", though legal in nature, are also terms within the securities regulatory industry, and Mr. Iles' explanation of these industry terminologies aided the jury in understanding how he reached his opinions.[13]

In the present case, the legal standard against which the testimony and evidence in the case were analyzed by Mr. Iles was the Texas Securities Act, and thus Mr. Iles' testimony, like the above referenced cases, was one on a mixed question of law and fact.

### 2. It is well settled that the questions of whether a certain instrument is a "security" and whether certain facts are "material" are mixed questions of law and fact.

In interpreting the Texas Securities Act (the "Act"), the Texas Supreme Court, citing Section 10-1(A) of the Act, acknowledged that the Texas legislature intended the Act to be interpreted in harmony with federal securities laws. *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 840 (Tex. 2005); *see* TSA, Tex. Rev. Civ.

---

[13] *See also Mega Child Care*, where the Fourteenth District Court of Appeals found that an expert witness' testimony as to whether the appellants in the case had operated a child care center in violation of the Human Resources Code was a mixed question of law and fact.  29 S.W.3d at 309.  The expert witness testified that the appellants were "operating under a violation of the law and violating quite a few standards in the minimum standards for daycare licensing." *Id.* The court found that such opinions were appropriate for expert testimony, stating "[h]ere, the legal standard against which appellants' actions were analyzed was Chapter 42 of the Human Resources Code.  Thus, [the expert] offered an opinion on a mixed question of law and fact regarding whether appellants' actions violated the code." *Id.* at 309-310.

Stat. Ann. 581-10-1(A) ("This Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration…") *see also Highland Capital Management, L.P.v Ryder Scott Co.*, 402 S.W.3d 719, 741 (Tex. App. ---Houston [1st Dist.]) ("Texas courts generally cite decisions of the federal courts to interpret the TSA."). Thus, the issue of whether a particular instrument is a security and the issue of materiality have been analyzed at both the state and federal levels in the context of securities laws.

Both the United States Supreme Court and Texas courts have recognized that the question of whether a particular instrument or transaction is a "security" is a mixed question of law and fact to be decided by the fact-finder.[14]   Likewise, the question of whether certain facts are "material" has also been held to be a mixed question of law and fact to be decided by the fact-finder.[15]

---

[14] *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."); *McConathy v. Dal Mac Commercial Real Estate, Inc.*, 545 S.W.2d 871, 875 (Tex. Civ. App.---Texarkana 1976, no writ) ("In determining whether a transaction is an investment contract, the courts will disregard the form and will look to the substance of the transaction, giving effect to the economic realities of the scheme."); *Bailey v. State*, 155 S.W.3d 346, 351 (Tex. App. ---El Paso, 2004), *rev'd on other grounds*, 201 S.W.3d 730 (Tex. Crim. App 2006) "([W]hether a certificate of deposit or some other labeled instrument is a security cannot be determined in the abstract but must be determined after a careful consideration of the context. It is, in other words, a fact question that should have been put to the jury with appropriate instructions."); *Digges v. State*, No. 05-10-00239-CR, 2012 WL 2444543, at 5 (Tex. App.---Dallas June 28, 2012) (mem. op., not designated for publication) ("[W]hether an investment qualifies as a security is a mixed question of law and fact.").
[15] *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) ("The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."); *U.S. v. Gaudin*, 55 U.S. 506 (1995) ("The question whether the defendant's statement was material to the federal agency's decision is the sort of mixed question of law and fact that

The facts and challenges to the expert testimony in *Digges v. State* are synonymous with those in the present case. *Digges v. State*, No. 05-10-00239-CR, 2012 WL 2444543 (Tex. App.---Dallas June 28, 2012) (mem. op., not designated for publication). In *Digges*, the appellant was appealing his securities fraud conviction, and had argued on appeal that the trial court had erred in allowing the securities expert to testify both abstractly about securities and specifically in giving an opinion in the case. *Id.* at 1,7. The securities expert in the case was Joseph Rotunda, the Director of the Enforcement Division of the Texas State Securities Board. *Id.* at 3. At trial, Mr. Rotunda gave his opinion that the agreements in the case were securities. The appellant in *Digges*, similar to Appellant in this case, had objected to Mr. Rotunda's testimony on the basis that it was "inappropriate, in the context of this proceeding where the role to decide questions of law should rest entirely and solely" with the judge. *Id.* at 7. Yet the Dallas Court of Appeals disagreed; affirming his conviction, the court found that "it was not inappropriate for the trial court to allow Rotunda to testify concerning this mixed question of law and fact." *Id.*

---

has typically been resolved by juries."); *Bridwell v. State*, 804 S.W.2d 900, 904 n. 7 (Tex. Crim. App. 1991); *Digges*, No. 05-10-00239-CR, 2012 WL 2444543, at 5 (Tex. App.---Dallas June 28, 2012) (mem. op., not designated for publication) ("Materiality is a factual issue properly submitted to the jury for determination.").

It is important to note that many of these cases have affirmed expert testimony that involved opinions on the ultimate issue of the case, such as whether a particular individual or company violated a legal code or standard or was negligent. *Birchfield*, 747 S.W.2d 361 (Tex. 1987); *Louder v. De Leon*, 754 S.W.2d 148 (Tex. 1988); *Mega Child Care*, 29 S.W.3d 303, 309 (Tex. App.---Houston [14th District] 2000), *aff'd* 145 S.W.3d 170 (Tex. 2004). This is notably important because, in this case, the State's expert never gave an opinion on whether the Appellant had violated the Texas Securities Act, had failed to disclose certain facts to victims, or had committed securities fraud.

Instead, Mr. Iles only gave an opinion that the transactions and agreements that took place between the victims and the Appellant were securities under the Texas Securities Act and that certain facts in evidence constituted "material" facts under the Act. Assuming the jury adopted all of the opinions of Mr. Iles, they still on their own had to determine whether the Appellant had intentionally failed to disclose those material facts in connection with the sale of securities, and that the State had proven he had done so beyond a reasonable doubt, in order to find him guilty.

**3. *Welder* and *Greenberg* support expert testimony on mixed questions of law and fact, yet both contain distinguishable facts that demonstrate the State's expert witness' testimony in this case was appropriate.**

Appellant relies on this Court's opinion in *Welder v. Welder*, 794 S.W.2d 420 (Tex. App--- Corpus Christi 1990, no writ), for the proposition that attorneys are prohibited from testifying as experts. (Appellant's Brief at 21). Yet the expert testimony at issue in that case was not the testimony of an expert who was an attorney, but an expert who was a tax accountant. *Id.* at 428-429. The expert in *Welder* had testified to the methodologies that he and his team had used in tracing assets to calculate which was separate property and which was community property, referencing the "community-out-first presumption" as one of the main tracing methods. *Id.* at 432. It is important to note that the "community-out-first presumption", as this Court acknowledged in *Welder,* was a *legal* rule of tracing that had been developed by courts to distinguish the character of funds which are withdrawn from an account of mixed separate and community funds. *Id.* at 433 (emphasis added).

Seeking to challenge that the legal rule the accountant had used in tracing the assets, the appellant's attorney had cross-examined the accountant by asking him to discuss and interpret specific caselaw. *Welder*, 794 S.W.2d at 428. This Court found such questions inappropriate in that the questions would just be

eliciting statements and interpretations of law from the accountant, finding that a challenge to a legal standard used by an expert was more appropriately reviewed by an appeals court. *Id.* at 433. Thus, as this Court observed *Welder*, while appellants have the right to challenge the impropriety of a legal standard or legal methodology used by an expert, it is "certainly" acceptable for an expert to explain his methodology in coming to his opinion, including the legal standard to which his opinion pertains, as long as it is within the context of applying the legal standard to the facts. *Welder*, 794 S.W.2d at 433.

Like the accountant in *Welder*, Mr. Iles explained terminology within the securities regulatory industry in order for the jury to follow how he arrived at his opinions which were directed at how the testimony in the case and the facts in evidence measured up to the legal standards of "security" and "materiality" within the industry.

Appellant also references *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56 (Tex. App.---Houston [14th Dist.] 2004). In that case, investors had brought a civil action against a corporation they had invested with, as well as the corporation's law firm, for conspiracy to commit securities fraud. *Id.* at 62-63. The law firm was appealing a judgment in favor of the investors based in part on their challenge of the testimony and opinions from the investors' expert witnesses at trial. *Id.* The investors' expert witnesses at trial consisted of a former securities

law professor from the University of Oklahoma College of law, and a former Justice of the Texas Supreme Court. *Id.* at 90.

While the court of appeals found that the trial court had committed reversible error in admitting their testimony, the testimony given by the experts is quite distinguishable from the testimony given by the State's expert in this case. During the former professor's testimony, the trial court allowed the admission of a Texas Pattern Jury Charge, in which the Professor was allowed to go through the charge and testify in detail about several duties owed by a fiduciary, including an attorney, to their client. *Id.* at. 94. Furthermore, the investors' trial counsel read verbatim portions of caselaw to the professor and asked him specific questions regarding the cases and the rationale behind the cases. *Id.*

The former Texas Supreme Court Justice during the majority of his testimony explained his interpretation of the Texas Disciplinary Rules of Professional Conduct, and also testified that the rules of professional conduct were relevant to establishing the standard of care with regard to the negligence of attorneys. *Id.* at 95. He also was allowed to testify on the role of a judge versus a jury member. *Id.* at 98-99.

The court of appeals, in analyzing the experts' testimony, found that both expert witnesses' testimony consisted of opinions and statements that were not only irrelevant to the issues of the case, but also alarmingly contrary to the law. *Id.*

at 97, 98. The harm in the admission of their opinions was thus undeniable, as the court of appeals also pointed out that the two experts' testimonies consisted of more than half of the investors' case, with one of the experts being on the stand for eight days- which consisted of exactly half of the trial. *Id.* at 99-100.

While the *Greenberg* court did caution at the end of its opinion the impact of attorneys testifying as legal experts, the experts in the *Greenberg* case, particularly the former Justice of the Texas Supreme Court who was able to explain the proper roles of judges and juries, may very well have "given the appearance that he had more authority than the trial judge, who was supposed to be the administrator of the court." *Id.* at 99. But the State's expert in this case gave no appearance of superiority to the trial judge or any impression that he was the one, instead of the judge, to give the jury the correct legal standard. On at least five separate occasions, jurors were told either by the judge, or Mr. Iles' himself, that the judge was the one who would instruct them as to the law.[16] Three separate times on cross-examination Mr. Iles affirmed this:

---

[16] (3 R.R. at 7:10-18) ("Members of the jury, I will decide matters of the law in this case, it is your duty to listen to and consider the evidence and to determine fact issues that may be submitted to you during the course of the trial. After you have heard all of the evidence, I will give you instructions to follow so that you can make your decision. The instructions will contain all of the instructions of the law that you will need in this case to make a decision."); (4 R.R. at 58: 7-8) ("Members of the jury, I want to remind you that I told you earlier that the Judge is to decide matters of law…"); (4 R.R. at 251:17-23; 4 R.R. at 252:14-16; 4 R.R. at 273:19-22).

Q: The basis, the legal basis of your opinions, is going to be the same law that is going to be provided to the jury by the Judge, correct?

A: I am not going to speak for Judge Banales. He is the one that tells us what the law is. And I am not going to say what he is going to rule on, in that regard.[17]

Q: But you agree with me that the Judge is going to tell the jury about the law, correct?

A: Correct.[18]

Q: Okay. And you agree, that the Judge is the one who is ultimately going to tell the jury what the legal standards are?

A: Yes, I do.[19]

The concerns that existed for the *Greenberg* court are distinguishable from the present case. Mr. Iles made it clear that it was the judge that was to decide what the legal standard was for the jury to use in its deliberations. Furthermore, unlike the expert witnesses in *Greenberg*, who were on the stand for multiple days and consisted of over half the time of trial, Mr. Iles was on the stand for approximately one hour and fifteen minutes, which included thirty-three minutes of cross examination. (4 R.R. at 220-273). Mr. Iles was one of eight witnesses that testified for the State. Mr. Iles did not represent the majority of the State's time or evidence, and thus, even if this Court were to find that the trial court committed

---

[17] (4 R.R. at 251:17-23)

[18] (4 R.R. at 252:14-16)

[19] (4 R.R. at 273:19-22)

85

error, the error would be harmless and not rise to the level of reversible error as the legally improper and irrelevant opinions of the experts in *Greenberg* were.

**B. The opinion given by the State's Expert aided the jury in its understanding of the case.**

While the trier of fact determines whether a particular instrument is a security, such a determination may not be an easy one, particularly in light of the terminology within the legal definitions and analyses required of the instruments alleged in the indictment in this case. The State specifically alleged in its securities fraud indictment that Appellant had committed fraud in connection with the offer and sale of "securities, to wit: promissory notes and investments contracts." (1 C.R. [654] at 6).

The Texas Securities Act, instead of providing one generic definition of the term "security", addresses it in its definition section as a term that is inclusive of certain types of transactions and instruments.[20] Tex. Rev. Civ. Stat. Ann. Art. 581-

---

[20] "The term 'security' or 'securities' shall include any limited partner interest in a limited partnership, share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. The term applies regardless of whether the 'security' or 'securities' are evidenced by a written instrument. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Texas Department of

4 (West 2010 & Supp. 2014). "Notes" and "Investment Contract" are included within that long list of transactions and instruments, though the Act does not provide any further guidance or definitions of these terms or instruments. Id.; *see also S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) ("The term 'investment contract' is undefined by the Securities Act or by relevant legislative reports.").

Instead, the interpretation of these terms, both at the federal and state level, has been done through the courts. *Howey*, 328 U.S. at 298 ("But [investment contract] was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute and, although the term was also undefined by the state laws, it had been broadly construed by state courts so as to afford the investing public a full measure of protection."); *Reves v. Ernst & Young*, 494 U.S. 56, 62 (1990) ("[t]he phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts.").

The prevailing rule in Texas is that "because of the obvious similarities between the Texas Securities Act and the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas act." *Campbell v. C.D. Payne and Geldermann Securities, Inc.*, 894 S.W.2d 411, 417 (Tex. App.--- Amarillo 1995) (*citing Searsy v. Commercial Trading*

---

Insurance when the form of such policy or contract has been duly filed with the Department as now or hereafter required by law."

87

*Corp.* 560 S.W.2d 637 (Tex. 1977) (interpreting the term "investment contract" under the Texas Securities Act).

The legal standard for an investment contract is whether there is an investment of money in a common enterprise with an expectation of profits which are to come solely from the efforts of others. *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *Searsy*, 560 S.W.2d at 640; *Clayton Brokerage Co. of St. Louis v. Mouer*, 520 S.W.2d 802 (Tex.Civ.App. Austin), *dism'd as moot on rehearing per curiam*, 531 S.W.2d 805 (Tex.1975); *King Commodity Co. of Texas v. State*, 508 S.W.2d 439 (Tex.Civ.App.-- Dallas 1974, *no writ*). This legal standard is typically broken down into four requirements: (1) an investment of money (2) a common enterprise (3) expectation of profits and (4) solely from the efforts of others. *Id.*

If this legal standard was not complicated enough, the Texas Supreme Court in *Searsy* espoused a test they thought reasonable in order to determine whether the last requirement of profits coming "solely from the efforts of others" is met: "[T]he more realistic test is 'whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise'." 560 S.W.2d at 641 (*citing S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 414 U.S. 821 (1973).

The legal standard in determining which notes are "securities" is just as complex. Both federal and Texas courts have adopted what is known as the "family resemblance test" in determining whether certain notes are securities or whether they are of the type that resemble more of a particular set of notes that have been judicially recognized as not securities, such as those related to consumer financing. *Reves*, 494 U.S. at 62, 66 ("We conclude, then, that in determining whether an instrument denominated a 'note' is a 'security', courts are to apply the version of the 'family resemblance' test that we have articulated."); *Campbell v. C.D. Payne and Geldermann Securities, Inc.*, 894 S.W.2d 411, 418 (Tex. App.--- Amarillo 1995) ("We find the 'family resemblance' test to be reasonable and applicable to the determination of whether the notes in question here were "securities" within the purview of the Texas Securities Act.")

While all notes are first presumed to be securities, this presumption can be rebutted by showing a strong resemblance to those already recognized as not securities, through the weighing of four factors: (1) the motivation of the transaction (2) the plan of distribution of the instrument (whether it is an instrument in which there is common trading for speculation or investment) (3) the reasonable expectations of the investing public and (4) whether there exists another regulatory scheme which significantly reduces the risk of the instrument. *Reves*, 494 U.S. at 66-67; *Campbell*, 894 S.W.2d at 418.

These are some of the legal standards that the jury in this case had to discern in making their decision of whether the transactions and agreements in the case were in fact "notes" or "investment contracts", and thus "securities", under the Texas Securities Act. It is thus not hard to see why it is not uncommon for the federal government and the State of Texas to utilize expert testimony of securities experts in order to aid juries in their understanding of the facts and evidence in complex securities cases.[21] Employees of the Texas State Securities Board have routinely filled this role.[22]

The State's expert in this case, also an employee of the Texas State Securities Board, explained the requirements of an investment contract and the factors to be analyzed when reviewing notes before he shared his opinions and walked the jury through the testimony and facts in evidence to show them how he

---

[21] *See United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *Highland Capital Management, L.P. v. Schneider*, 551 F.Supp.2d 173, 178 (S.D.N.Y. 2008) ("In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry."); *See also Cox v. State*, 523 S.W.2d 695 (Tex. Crim. App. 1975); *Rose v. State*, 716 S.W.2d 162 (Tex. App.---Dallas 1986); *Huett v. State*, No. 05-95-00964-CR, 1998 WL 297206 (Tex. App.---Dallas June 9, 1998) (mem. op., not designated for publication); *Digges v. State*, No. 05-10-00239-CR, 2012 WL 2444543 (Tex. App.---Dallas June 28, 2012) (mem. op., not designated for publication).

[22] *Cox*, *Rose*, *Huett*, and *Digges*, supra n. 21, are all Texas cases in which at least one employee of the Texas State Securities Board testified in an expert capacity for the State. *Id.*

came to his opinions that those legal standards had been met. (4 R.R. 227:24-241:23). So while experts in general are not permitted to testify on questions of pure law, "where the words or phrases are technical and aid is needed in their interpretation there is no prohibition against the use of expert opinion testimony." *Templeton v. Dreiss*, 961 S.W.2d 645, 673 (Tex. App.---San Antonio 1998).

Yet even as complicated as some of the legal analysis and requirements of the law are with regard to understanding securities, the First District Court of Appeals out of Houston recognized that expert testimony may also be appropriate for specifically applying a legal standard to a set of facts, even if that legal standard or regulation seems to be in straightforward, clear language:

> Clear regulatory language, cast in ordinary and familiar words, is not enough. Without express standards in a regulation for guidance, a jury lacks a critical stepping stone toward forming an opinion regarding whether the abstract mandate of the regulation has as a factual matter been met, and is not equally as able to form such an opinion as a person familiar, through prior experience, with what, factually, constitutes compliance with the regulation. In such an instance, the specialized experience and knowledge of others, via their testimony as expert witnesses, is called for, to assist the jury to measure compliance with the regulation—and, when offered in such an instance, such testimony should be admitted. Accordingly, [the expert's] opinion was an admissible opinion on a mixed question of law and fact, not an inadmissible opinion on a pure question of law.

*Lyondell Petrochemical Co. v. Fluor Daniel, Inc.*, 888 S.W.2d 547, 555 (Tex. App.-Houston [1st Dist. 1994), *writ denied* (Mar. 30, 1995). Expert testimony is appropriate in not only those cases in which there are complex terms in which a

jury may be unfamiliar, but also those cases in which expertise and knowledge of the subject matter could also aid the jury in understanding how the facts and evidence of a particular case measure up to an particular regulation or legal standard within an industry. In this case, the State's expert witness aided the jury in doing both- he explained investment contract, notes, and materiality, and then walked the jury through the facts and evidence when sharing with them how he came to his opinions that the agreements in the case were securities and that certain facts in evidence were material.

Moreover, without the aid of expert guidance on questions that are necessarily mixed questions of securities law and facts, an average jury member could be prevented from otherwise realizing or grasping the significance of certain testimony or facts until long after at the conclusion of the case. This reality was recognized by the *Crum* court who observed:

> In our system, the trial judge does not generally instruct the jury as to the law of the case until all the evidence is in, but in a case with complex factual and legal issues such as this, it may be difficult for the jury to understand the ramifications of the evidence without guidance while it is being introduced. Any legal explanation by the judge during the introduction of the evidence might be construed as an impermissible comment on the weight of the evidence, and judges are not generally prepared at that point in the trial to give such instructions.

887 S.W.2d at 134-135. The State's expert witness aided the jury in understanding certain terminology within the securities laws that assisted them in understanding

the significance of the evidence and testimony they heard, even providing examples, such as the types of notes that are not considered securities, to help them fully grasp terms that they would use in their decision. (4 R.R. 231:13 - 232:2).

Ultimately, at the end of the day, "the threshold determination for admitting expert testimony is whether such testimony, if believed, will assist the untrained layman trier of fact to understand the evidence or determine a fact in issue." *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993). In cases in involving securities fraud, such as the present case, opinion testimony like the one given by the State's expert witness, is an incredible aid to the jury in understanding an unfamiliar industry with terminology that the jury must use when reviewing and analyzing the facts and testimony that were presented to them.

**C. The State's Expert Witness was qualified to testify as an expert witness in Securities Regulation.**

Finally, while Appellant suggests that his challenge to the State's expert witness includes a challenge to his qualifications, Appellant's trial counsel, after having an opportunity to cross-examine Mr. Iles during a *Daubert* Challenge, objected only to Mr. Iles' opinions, and never made any objection to his qualifications. (4 R.R. at 208:6-21). Moreover, the record contains ample testimony from Mr. Iles demonstrating his extensive background in securities regulation to support the trial court's decision to allow him to testify as an expert.

Mr. Iles testified that he had been a licensed to practice as an attorney in Texas since 2002. (4 R.R. at 178:25, 179:1). He began his employment with the Texas State Securities Board ("TSSB") in 2001 as an attorney in the agency's Inspections and Compliance Division, and after a few years in that division, he transitioned to work as an attorney in the agency's Enforcement Division. (4 R.R. at 178:7-10). At the time of trial, he was serving as the Assistant Director of Enforcement of the agency's Austin Branch Office. (4 R.R. at 178:11-15).

Mr. Iles testified he had served as a special assistant prosecutor for several different counties' District Attorney's Offices around the State of Texas and had testified in both state and federal proceedings as a witness. He was an active member in the North American Securities Administrator's Association, and testified that he had participated in numerous training presentations and panels in securities related conferences and seminars. (4 R.R. at 182:9-25).

In his position as Assistant Director of Enforcement, Mr. Iles testified that, he served in a supervisory capacity over the other staff attorneys and financial examiners in the Austin office. (4 R.R. at 184:1-11). He also testified that his work, on almost a daily basis, involved determining whether or not certain transactions and products appeared to be securities, giving the agency jurisdictional authority to conduct investigations and enforce any violations of the Texas Securities Act. (4 R.R. at 184:12 -186:1). Given Mr. Iles' extensive background

and experience in securities regulation, and the fact that Appellant's trial counsel never objected to Mr. Iles' qualifications as an expert witness, the trial court did not abuse its discretion in determining Mr. Iles was qualified to testify as an expert witness.

Appellant in his brief alludes to the fact that his trial counsel did not have enough time to prepare for cross examination of Mr. Iles due to the fact they had not received a curriculum vitae or report before trial. (Appellant Brief's at 20). However, Appellant fails to mention that the only time such documents were requested from the State were verbally requested on the Friday before the Monday of trial. It is also important to note that Appellant never filed a motion with the trial court or served upon the State a request for a curriculum vitae or report from its disclosed expert.

Appellant had notice prior to trial about the nature of Mr. Iles' testimony as he was designated as the State's securities expert in the State's *Motion To Exempt Witnesses From the Rule.* (*See* 13-14-00654-CR, C.R. at 23-26). The State's *Motion* explained its request for Mr. Iles to be exempt from the rule due to the fact that he would be reaching and basing his opinions upon the testimony and evidence admitted during trial. Mr. Iles thus had no opinions to report prior to the time of trial.

Despite there not being a report before trial, the trial court provided Appellant's trial counsel the opportunity to voir dire and cross examine Mr. Iles outside of the presence of the jury. The trial court at this time also allowed the State to proffer the entire testimony of Mr. Iles that it planned to elicit in front of the jury, giving Appellant's trial counsel an exact account of the questions Mr. Iles would be answering and the opinions he would be giving.

In summary, the State's securities regulatory expert in this case was qualified to testify as an expert, gave appropriate opinion testimony on issues that are mixed questions of law and fact, and aided the jury in its understanding of standards within the securities industry and how the facts and testimony of this case measured up to those standards. As such, the trial court did not abuse its discretion in allowing the State's expert to give expert testimony.

## VI. **The trial court did not error in denying Appellant a directed verdict because when multiple offenses are aggregated into one offense, the proper venue for prosecution is any county in which any of the individual offenses, or any element thereof, occurred, even though venue for some of the individual offenses, if tried separately, would be in different counties.**

In Appellant's sixth issue, he asserts that there was insufficient proof of venue in Nueces County, Texas for one of the victims in the indictment, Susan Morris, and that an instructed verdict should have been granted to Appellant.

In reviewing the legal sufficiency of the evidence of venue, it is to be viewed in the light most favorable to the verdict, and then a determination is to be made as

to whether a rational trier of fact could have found venue was proper by a preponderance of the evidence. *Dewalt v. State*, 307 S.W.3d 437, 457 (Tex. App.--Austin 2010); Code Crim. Proc. Ann. art. 13.17 (West Supp. 2014). Proof of venue may be established by direct or circumstantial evidence. *See Black v. State*, 645 S.W.2d 789, 791 (Tex. Crim. App. 1983).

When elements of a *single* offense are committed in more than one county, the proper venue for prosecution of that offense may be established in either county where any one of the elements occurred. *Wood v. State*, 573 S.W.2d 207, 210–211 (Tex. Crim. App. 1978). Likewise, when multiple offenses that have occurred in more than one county have been aggregated together under a single offense, the proper venue may be established in any county where any one of the individual offenses occurred. *State v. Weaver*, 982 S.W.2d 892 (Tex. Crim. App. 1998).

In defendant in *Weaver* had been indicted in Harris County for theft in an amount between $20,000 and $100,000. 982 S.W.2d at 892. Pursuant to Section 31.09 of the Texas Penal Code, the indictment had aggregated into a single offense multiple thefts involving 32 victims that had occurred over a year and half period of time. *Id.* at 893. The indictment alleged these thefts were "pursuant to one scheme and continuing course of conduct." *Id.* at 893. While some of the

individual thefts had occurred in Harris County, some had occurred outside of Harris County. *Id.*

The defendant on appeal had sought to sever the non-Harris County thefts from the aggregated theft charge, arguing that venue for prosecution of those offenses would not have been proper in Harris County. *Id.* at 893. The Texas Court of Criminal Appeals disagreed, holding that Harris County was a proper venue for all of the thefts that had been aggregated into the single offense, even those committed outside of Harris County. *Id.* at 893 ("When several thefts are aggregated into a single offense under Section 31.09, the proper county for prosecution…is any county in which the individual thefts or any element thereof occurred.")

In support of its holding, the Court of Criminal Appeals, in interpreting aggregation in the penal code, reasoned that there was "no indication the 63rd Legislature intended Section 31.09 to apply only to a thief who commits multiple thef'ts in the same county." *Weaver*, 982 S.W.2d at 895. It also observed that there was "no indication the 63rd Legislature intended to treat thieves who commit multiple thefts in the same county any differently from thieves who commit multiple thefts in different counties." *Id.* This case made clear that in aggregated offenses, the State is not under an obligation to prove that all of the individual offenses occurred within the county that the prosecution takes place. The Court of

Criminal Appeal's holding in *Weaver* directly contradicts Appellant's assertion that he was entitled to a directed verdict due to the fact that the offenses against the Morrises occurred outside of Nueces County.

The facts of the present case are very similar to *Weaver*. Appellant sold investments totaling $150,000 to four families over a period of nineteen months from March 2011 through October 2012. (2 R.R. at 33-34; 4 R.R. at 12, 129-130, 151; 7 R.R. at State's Ex. 4,7, 21, 23). During this time period, Appellant resided in Corpus Christi, Texas at 467 Southern Street and later at 422 Sharon Street. (5 R.R. at 90). Appellant testified that his office was in his home during this time period. (5 R.R. at 67). Three of the four victims named in the indictment resided in Corpus Christi and testified that the Appellant met with them in their homes when he offered and sold them the investments. (2 R.R. at 27, 30; 4 R.R. at 6, 10; 4 R.R. at 128).

Though the Appellant met with Susan and Stephen Morris at their home in San Patricio County, there was evidence presented at trial that Appellant contacted Mr. Morris via telephone to discuss and explain the commodities investment opportunity prior to the in-person meeting at their home. (4 R.R. at163-164). Moreover, the very same day that the Morris' funds became available to Appellant, he used their funds to write a $35,000 check to Judson Hall, one of the other victims who resided in Nueces County, and delivered that check to Mr. Hall in

Nueces County, Texas in furtherance of his scheme and continuing course of conduct. (4 R.R. at 134; 4 R.R. at 103).

Like the indictment in *Weaver*, the indictments in the present case alleged that all monies were obtained pursuant to "one scheme and continuing course of conduct." (1 C.R. [653] at 6-7; 1 C.R. [654] at 6-8). Both the theft and securities fraud offenses in the present case are aggregated offenses,[23] and thus venue for such offenses is proper in any county in which any of the individual offenses occurred. The record in this case establishes that at least three the individual theft and securities fraud offenses occurred here in Nueces County, and therefore Nueces County was a proper venue for prosecution of all the offenses in the indictment, even those concerning Susan Morris. Thus, the trial court did not error in denying Appellant a directed verdict, and Appellant's sixth issue on appeal should be overruled.

---

[23] Section 29-2 of the Texas Securities Act mirrors the language in Section 31.09 of the Penal Code: "When amounts are obtained in violation of this Act under one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." Tex. Rev. Civ. Stat. Ann. Art. 581-29-2 (West 2010 & Supp. 2014).

**VII. The trial court did not abuse its discretion in denying Appellant's request for a particularly worded instruction on witness bias because the requested bias instruction would have been duplicative and a direct comment on the credibility of the State's witnesses, in the alternative, even if it was error to deny the requested instruction, the error was harmless.**

At trial, Appellant's trial counsel objected that their request for a particularly worded instruction regarding witness bias had not been included in the jury charge. (5 R.R. at 109). The trial court overruled the objection. (Id.). Appellant's requested instruction began with the language, "[y]ou are the sole judges of the credibility or 'believability' of each witness and the weight to be given the witness's testimony. An important part of your job will be making judgments about the testimony of witnesses including the defendant who testified in this case." (1 C.R. [654] at 96-97). This language was similar to the language that was included in the charge that was ultimately read and given to the jury, which read:

> No statement, ruling or remark which I may have made during the presentation of testimony was intended to indicate my opinion as to what the facts are. You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony, but the law you shall receive in these written instructions and you must be governed thereby. In determining the credibility of the witnesses, you alone must decide upon the believability of the evidence and its weight and value.

1 C.R. [654] at 108. With regard to the beginning of Appellant's requested instruction, and any similar language contained within it, the requested language would be largely duplicative to what the trial court gave as instructions to the jury.

101

Indeed, if such language had been the extent of the requested instruction, the State likely would not have taken issue with it. Yet Appellant's requested instruction went much farther.

In particular, the requested charge included several paragraphs containing a series of questions that the judge was to direct the jury members to specifically ask themselves in weighing the credibility and motive of the witnesses. (1 C.R. at [654] at 96-97; 5 R.R. at 7). Specifically, the charge would have required the Judge to make particular suggestions in the thought process of the jury with regard to the witnesses in the case:

> I *suggest* that you ask yourself a few questions. Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? *Did the witness have any relationship with either the government or the defense?*

(1 C.R. [654] at 96) (emphasis added). The aim at having such language was to direct the judge to instruct the jury to specifically question the credibility of a witness that had a relationship with the government. This purpose is confirmed in Appellant's brief when he asserts that the instruction was aimed in particular at one of the State's witness, stating "defense asked for and did not receive a jury instruction regarding the bias of witnesses, *specifically the expert witness, Travis Iles*." (Appellant's Brief at 23) (emphasis added). Appellant went on to explain the reason behind the request stemmed from testimony during trial that the State's

expert witness "worked for the agency prosecuting the exact same crime alleged." (Appellant's Brief at 23). This type of targeting of particular witnesses, or suggestions by a judge to question the credibility of particular witnesses, is strictly prohibited. *In re T.T.*, 39 S.W.3d 355, 359 (Tex. App. ---Houston [1st Dist.]2001) ("[O]ur statutes, court-made rules, and judicial decisions emphatically and repeatedly prohibit Texas judges from commenting on the weight of the evidence.").

Article 36.14 of the Texas Code of Criminal Procedure clearly dictates that a trial court in a written jury charge is strictly prohibited from "expressing any opinion as to the weight of the evidence, summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse sympathy or excite the passions of the jury." Code Crim. Proc. Ann. art. 36.14 (West Supp. 2014). The requested language in Appellant's proposed instruction would have amounted to the trial court making an impermissible comment on the credibility of the State's witnesses.

The jury charge in this case accurately reflected the law when it instructed that "you alone must decide upon the believability of the evidence and its weight and value." (1 C.R. [654] at 108). For it is jurors, and not the trial court, that are the exclusive judges of the credibility of the witnesses and the weight to give their testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex.Crim.App.2008) ("The

jurors are the exclusive judges of the facts and the weight to be given to the testimony."); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000) ("The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to give their testimony.").

Under Appellant's rationale that such an instruction was needed due to the fact that an expert witness happened to be employed by the same governmental unit that was also prosecuting the case, any detective from a district attorney's office, who testifies in an expert capacity based upon their experience in the field, would warrant such an instruction. The trial court was within its discretion in denying the exact language of the Appellant's requested instruction because it had comparable language that reflected the law, and Appellant's specific language could have amounted to an impermissible comment by the trial court on the credibility of the State's witnesses.

In the alternative, even if this Court were to find that the trial court abused its discretion in not adopting Appellant's precise requested language, the denial of this request was harmless. When reviewing the degree of harm, the harm must be determined by reviewing the whole jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record. *Almanza v. State*, 686

S.W.2d 157, 171 (Tex. Crim. App. 1984); *Kemph v. State*, 12 S.W.3d 530, 533 (Tex. App.--- San Anontio, 1999).

As Appellant alluded to in his brief, Appellant's trial counsel brought out on cross examination of the State's expert witness that he was employed with the same agency that employed some of the prosecuting attorneys. (4 R.R. at 248-249). Appellant's attorneys clearly communicated to the jury their bias concerns of the State's expert when one of the Appellant's trial counsel asked him point blank on cross examination, "Would you agree with me or is it fair to say that you are a biased witness?" (4 R.R. at 248). He was also asked, "And so you are with the same bureaucracy, correct?" (4 R.R. at 249).

Again, during closing argument, Appellant's trial counsel alluded to the fact that they believe the State's expert witness was biased by, referring to him several times as the State prosecutors' "boss". (5 R.R. at 128). Appellant's trial counsel argued at one point:

> And frankly, their boss is biased. I think that is inaccurate to come up here and be a bureaucrat in the same organization, to be the boss of the prosecutors and to come up here and say that he is not biased. I think that is not true.

(5 R.R. at 135). The jury clearly understood that Appellant's trial counsel believed that the State's expert was biased. To be denied a jury charge that perhaps suggested bias was not harmful to Appellant because the jury, in having the opportunity to hear Appellant's cross examination and closing argument, had heard

105

enough facts about the State's expert witness to make its own determination of whether they found him credible. As such, the trial court in this case did not abuse its discretion, and even if it were found that it did, its denial of Appellant's requested language in the jury instructions was harmless.

## VIII. Aside from a brief reference to the Texas Constitution, Appellant fails to cite any authority in support of his eighth issue on appeal and thereby has inadequately briefed the issue, leaving this Court nothing to review on the matter.

Texas Rule of Appellate Procedure 38.1 requires that an appellant's brief must include "appropriate citations to authority and to the record." Tex. R. App. P. 38.1(i). The Texas Court of Criminal Appeals has held that "[w]hen a party raises a point of error without citation of authorities or argument, nothing is presented for appellate review." *State v. Gonzalez*, 855 S.W.2d 692, 697 (Tex. Crim. App. 1993). Likewise, general citations to certain articles or amendments, without more, will result in an issue being deemed inadequately briefed and overruled. *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) ("It is not sufficient that appellant globally cite the 'Sixth Amendment,' and nothing else, in support of his request for reversal…Point of error two is inadequately briefed, and it is, therefore overruled.") *See also Ex parte Hernandez*, 953 S.W.2d 275 (Tex. Crim. App. 1997) ("These are merely bare assertions unsupported by argument, analysis, or authority. Therefore, this Court shall not consider appellant's state constitutional argument.").

In this case, Appellant's argument for his eighth issue on appeal is comprised of the following three sentences:

> In this subject case, the State has taken a contractual agreement, civil in nature in  to the realm of criminal prosecution.  This is a violation of the Defendant's constitutional right against incarceration for mere debts.  As the Constitution of   the State of Texas states, "No person shall ever be imprisoned for debt." Tex. Const. Art. I, §8.

(Appellant's Brief at 24).  Appellant cites no other legal authority for this position, besides the "global cite" to a particular article of the Texas Constitution.  He also fails to cite any facts or anywhere to the record or even any exhibits in support of his position that the case at hand is civil and not criminal in nature, and only involves "mere debts."  Appellant has clearly inadequately briefed this issue, and therefore this Court should not consider this argument on appeal.

Moreover, while the Constitution for the State of Texas may prohibit imprisonment for mere failure to pay a debt, it does not prohibit imprisonment for fraud or deception in connection with what might be considered a "debt." Even the definition of "security" under the Texas Securities Act includes "notes" and "evidence of indebtedness" as examples of transactions and instruments that are included within the definition of security.  Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-4(A) (West 2010 & Supp. 2014).  In light of the foregoing, this Court should overrule Appellant's eighth issue.

**IX. The evidence, viewed in the light most favorable to the prosecution, is sufficient for a rational tier of fact to have found beyond a reasonable doubt that Appellant that the requisite intent to commit securities fraud and theft.**

In Appellant's ninth issue, he asserts that the State did not meet its burden in establishing the requisite criminal intent for the offenses that he was convicted of in this case. (Appellant's Brief at 24-25). In reviewing the sufficiency of the evidence, a court must view "all of the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Christensen v. State*, 240 S.W.3d 25, 31(Tex. App.--Houston 2007) (*citing King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).

The Court of Criminal Appeals has also held that when reviewing the sufficiency of the evidence with regard to intent, that "[courts] should look at events occurring before, during and after the commission of the offense." *Taylor v. State*, 450 S.W.3d 528, 536 (Tex. App.--Houston 2014); *Wirth v. State*, 361 S.W.3d 694, 697 (Tex.Crim.App. 2012). A jury may infer intent from any facts that tend to prove its existence, such as the acts, words and conduct of the defendant. *Christensen*, 240 S.W.3d at 32 (*citing Hernandez v. State*, 829 S.W.2d 806, 810 (Tex. Crim. App. 1991). Appellant supports his challenges to the intent element of both offenses on two grounds. First, Appellant points to the self-serving testimony of Appellant at trial in which "[he] testified that he always

intended to invest the money as per his agreement with the victims, and he also promised to pay the witnesses back for any losses they incurred." (Appellant's Brief at 25). Second, Appellant asserts that because he partially performed by "both investing some money and paying some moneys owed to the witnesses", that this also shows he had no criminal intent. (Appellant's Brief at 25).

### A. The Appellant's self-serving claims that he had no intent to deceive and defraud the victims in this case stands in stark contrast to Appellant's immediate use of investor funds to cover his personal expenses and his mounting financial difficulties.

Despite Appellant's testimony that it was his intent to invest the victims money as he agreed with them, the record is replete with testimony and evidence from which a rational juror could infer Appellant's criminal intent.

For example, Diane Lechuga invested $25,000 with Appellant on March 22, 2011; the funds became available to Appellant on March 23, 2011. (4 R.R. at 90-91). Prior to Ms. Lechuga's investment, the balance in Appellant's bank account was $64.28. (4 R.R. at 90-91). The very next day, Appellant wrote a check, dated March 24, 2011 in the amount of $3,589.50 to three months of unpaid, past due rent. (4 R.R. at 91; 7 R.R. at State's Ex. 15). Appellant himself admitted to using Ms. Lechuga's funds in this manner. (5 R.R. at 90, 95-96). The State's financial examiner testified that Appellant used Ms. Lechuga's funds to also pay for credit card bills, restaurants and groceries, and child support, and that all of her funds were spent in less than a month, with an ending balance of $-161.10 in Appellant's

account by April 22, 2011. (4 R.R. at 92). Appellant wasted no time in using this victim's funds to cover his personal expenses, and a rationale trier of fact could have viewed these actions as evidence of his criminal intent.

Another timeline that demonstrates Appellant's intent to defraud the victims in this case is the timeline surrounding Judson Hall's investment and Susan and Stephen Morris' investment. Judson Hall testified that he invested $50,000 with Appellant on September 5, 2011, but over time had become concerned about his investment due to Appellant failing to make promised interest payments. (4 R.R. at 130, 133). This concern led Mr. Hall, one month prior to the 1 year term of the agreement (September 2012), to notify Appellant he wanted his $50,000 returned to him, pursuant to their agreement. (4 R.R. at 133).

Mr. Hall testified that Appellant represented to him that it may take him awhile to return his funds since he had to pull them out of all the investments that had them in. (4 R.R. at 133). Upon tendering a check to Mr. Hall for $35,000, Mr. Hall testified that Appellant told him to hold the check for a week, because "Frost Bank would not release the funds" until then. (4 R.R. at 134). The reality was, Appellant was waiting for the funds from Susan and Stephen Morris' $50,000 investment to become available in his account, which he had just deposited the day before. (4 R.R. at 101). State's Exhibits 16 and 19 reflect that the majority of Jud Hall's and Mr. and Mrs. Morris' investment funds were used to make Ponzi like

payments to earlier investors and for personal expenses including child support, rent, groceries and loan payments. (7 R.R. at State's Ex. 16, 19).

Courts have held that deception after an alleged crime is a circumstance that may permit an inference of guilt." *Christensen,* 240 S.W.3d at 35; *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1979). When asked by Investigator Sabban what he specifically did with the victims' funds, the Appellant stated that he had deposited all of the victims' funds into his Mays Financial Group account at Frost Bank, and from there had transferred "100% of the funds" to a TD Ameritrade account, where he would use the funds in trading. (4 R.R. at 61). The financial examiner, Eliza Lujan, later testified that only a small amount of funds were ever transferred to TD Ameritrade, with the majority being transferred right back to his Frost bank account. (4 R.R. at 99-100; 103:21-104:7). A rationale trier of fact could have inferred guilt and criminal intent from Appellant's deceptive remarks to Investigator Sabban.

A rational trier of fact could similarly have inferred guilt and criminal intent from Appellant's test message conversations he had with Kathleen Trial. (7 R.R. at State's Ex. 3). In these conversations, the jury heard Appellant make several different representations as to how he was using Ms. Trial's funds and how he was allegedly making profits for Mays Financial Group, including investing in imported water from Alaskan glaciers, purchasing property tax certificates, and

flipping houses (7 R.R. at 10, 15,18-19, 21). Appellant in these texts also represented at different times that he was waiting on TD Ameritrade wires that he had already requested, along with similar transfers he had already made, in order to pay Mrs. Trial her monthly interest payments; as the texts indicate, these payments never came. (7 R.R. at 16-17, 20, 24). A rationale trier of fact could have inferred guilt from these texts as being deceptive in nature, particularly after reviewing the State financial examiner's charts on how the Appellant spent the victims' funds. (7 R.R. at State's Ex. 15-20).

### B. Appellant's phony interest payments to victims, along with his method of transferring a small amount of victim funds to his TD Ameritrade Account, and then back to his Frost Bank account, demonstrate a clear criminal intent to hide his actions in furtherance of his scheme, not partial performance.

Appellant suggests that his "partial performance" of both investing some funds and making "interest" payments to the victims, demonstrates that he lacked the requisite criminal intent for Securities Fraud and Theft. In *Taylor v. State*, the Houston Court of Appeals observed that the mere existence of partial performance may not negate criminal intent:

> [T]he fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation. A contractor still may be convicted of theft under circumstances—to be sure, circumstances beyond the mere "failure to perform the promise in issue"—in which a rational fact-finder could readily conclude that he never intended, even at the outset, to perform fully or satisfactorily on the contract, and always

112

harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully appropriated.

450 S.W.3d 528, 537 (Tex. App.--Houston 2014); *See Merryman v. State*, 391 S.W.3d 261, 272 (Tex. App.--San Antonio 2012, pet ref'd). Furthermore, the Court of Appeals of Houston in *Christensen*, a case cited by Appellant, observed that courts are not only to consider partial performance, but also whether a defendant experienced personal gain from the property obtained from alleged victims and whether a defendant used deception to obtain the property. 240 S.W.2d at 32-34.

At trial, Appellant introduced Defendant's Exhibit 1, which outlined the purported interest payments he had made to the victims, along with the partial return of $43,000, of Judson Hall's investment. (7 R.R. at Def. Ex. 1). The Appellant admitted that the only investor that received more than about $2,000 in interest payments was Judson Hall, whom he admitted to partially paying back by using the investment funds he had received from Susan and Stephen Morris. (5 R.R. at 105, 106).

The exhibit showed that Susan and Stephen Morris, after investing $50,000 had received $1,000, Kathleen Trial after investing $25,000 had received $1,875, and Diane Lechuga after investing $25,000, had received $2,007.96 from Appellant. (7 R.R. at Def. Ex. 1). Yet these payments were supposed to be interest payments generated from the profits that Appellant was making from

113

investing the victims' funds. (7 R.R. at State's Ex. 2, 5, 13, 14, 21, 24). Appellant had a direct interest in making these payments, in order to appear that he had properly invested these victims funds and was actively making profits off of such investments. In fact, the victims testified they began to question Appellant's motives and actions with their money when he started failing to make these payments. (3 R.R. at 36-37; 4 R.R. at 15-16, 132-133, 154-155; 7 R.R. at State's Ex. 3).

It was also demonstrated by the State's financial examiner in her charts, that the purported "interest" payments received by these victims did not originate from any profits generated by Appellant, but originated from the funds of other investors. (7 R.R. at State's Ex. 15-20). A rational trial trier of fact could have inferred that making these phony "interest" payments was necessary for Appellant to further his scheme and delay his actions from being discovered.

The testimony from the State's financial examiner regarding Appellant's TD Ameritrade account also sheds light on Appellant's claims of partial performance by investing some of the victims' funds. The financial examiner testified that out of the $34,000 of victim funds that she observed Appellant transfer to his TD Ameritrade account, he transferred back $31,180. (4 R.R. at 109). These funds did not represent profits made from the TD Ameritrade account, as the financial examiner testified that the total amount of profits Appellant generated from the

account was $1,857.20 (Id.), demonstrating that Appellant had simply moved investor funds back and forth between his accounts.

Such actions could have caused a rationale trier of fact to believe that the small amount of monies invested by the Appellant, and payments made in furtherance of his scheme, using other investor funds, was to put on an appearance of intending to satisfy his obligations to the investors while knowing he would not. *See Taylor*, 450 S.W.3d at 539.

Each of the cases cited by Appellant in his brief are distinguishable from the facts in this case, for those courts found that there had been substantial performance of the matters for which funds had been tendered. In *Peterson*, the Court held the evidence was legally insufficient to show criminal intent when the construction project was 95% complete. *See Peterson v. State*, 645 S.W.2d 807, 811-812 (Tex. Crim. App. 1983). In *Martinez*, the evidence was legally insufficient to show theft when evidence showed payment of "almost half of the amount owed" before a dispute even arose as to the amount that was still unpaid. *See Martinez v. State*, 754 S.W.2d 799,800 (Tex. App.-San Antonio 1988, pet. ref'd). In *Cox*, the evidence showed that "a great deal of the services" had been performed and there was no evidence to show any representation or promise that was false at the time the complainant surrendered any money to the defendant in

that case. *See Cox v. State*, 658 S.W.2d 668, 670 (Tex. App.-Dallas 1983, pet. ref'd).

The present case is distinguishable from these referenced cases because the record is clear that Appellant used the vast majority of the funds for his own personal gain including rent, utilities, child support, credit card payments, loan payments, groceries, fuel and truck insurance. (7 R.R., Exhibit 15-16; 18-19). Testimony from the victims that had they known of the financial difficulties Appellant and his company were experiencing, they would never have invested, demonstrated the motive Appellant had in not disclosing these material facts to them when he solicited them to invest in his company. Overall, this evidence was sufficient for a rational juror to find beyond a reasonable doubt that Appellant acted with criminal intent as the record was full of evidence of deception and personal financial gain by Appellant. *Christensen*, 240 S.W.2d at 32-34.

## PRAYER FOR RELIEF

Appellant's trial was without prejudicial error, and his constitutional rights were not violated. For the foregoing reasons, the State respectfully requests that the judgment of the trial court be affirmed. See Tex. R. App. P. 43.2(a).

_Melanie K. Good_

Melanie K. Good
State Bar No. 24074735
Special Assistant District Attorney
606 N. Carancahua, STE 803
Corpus Christi, Texas 78401
Phone: (361) 887-1085
Fax: (361) 884-7820

## CERTIFICATE OF COMPLIANCE

This is to certify that the word county of the computer program used to prepare this brief indicates that such brief contains 29,386 words, not counting the following if part of this brief: the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. See Tex. R. App. P. 9.4(i).

_Melanie Good_

Melanie Good

## CERTIFICATE OF SERVICE

This is to certify that a copy of this brief was served via certified electronic service provider (or mailed if electronic service could not be made) this 24th day of September 2015, to Appellant's attorney, John Lamerson, P.O. Box 241, Corpus Christi, Texas 78403; lamersonlawfirm@gmail.com

_Melanie Good_

Melanie Good

# THE TEXAS SECURITIES ACT

**Sec. 1. Short Title of Act.** This Act shall be known and may be cited as "The Securities Act."

**Sec. 4. Definitions.** The following terms shall, unless the context otherwise indicates, have the following respective meanings:

A. The term "security" or "securities" shall include any limited partner interest in a limited partnership, share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, preorganization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not. The term applies regardless of whether the "security" or "securities" are evidenced by a written instrument. Provided, however, that this definition shall not apply to any insurance policy, endowment policy, annuity contract, optional annuity contract, or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Texas Department of Insurance when the form of such policy or contract has been duly filed with the Department as now or hereafter required by law.

B. The terms "person" and "company" shall include a corporation, person, joint stock company, partnership, limited partnership, association, company, firm, syndicate, trust, incorporated or unincorporated, heretofore or hereafter formed under the laws of this or any other state, country, sovereignty or political subdivision thereof, and shall include a government, or a political subdivision or agency thereof. As used herein, the term "trust" shall be deemed to include a common law trust, but shall not include a trust created or appointed under or by virtue of a last will and testament or by a court of law or equity.

C. The term "dealer" shall include every person or company other than an agent, who engages in this state, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to or orders for, or undertaking to dispose of, or to invite offers for any security or securities and every person or company who deals in any other manner in any security or securities within this state. Any issuer other than a registered dealer of a security or securities, who, directly or through any person or company, other than a registered dealer, offers for sale, sells or makes sales of its own security or securities shall be deemed a dealer and shall be required to comply with the provisions hereof; provided, however, this section or provision shall not apply to such issuer when such security or securities are offered for sale or sold either to a registered dealer or only by or through a registered dealer acting as fiscal

agent for the issuer; and provided further, this section or provision shall not apply to such issuer if the transaction is within the exemptions contained in the provisions of Section 5 of this Act.

D. The term "agent" shall include every person or company employed or appointed or authorized by a dealer to sell, offer for sale or delivery, or solicit subscriptions to or orders for, or deal in any other manner, in securities within this state, whether by direct act or through subagents; provided, that the officers of a corporation or partners of a partnership shall not be deemed agents solely because of their status as officers or partners, where such corporation or partnership is registered as a dealer hereunder.

E. The terms "sale" or "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value. The term "sale" means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other things of value, or any transfer or agreement to transfer, in trust or otherwise. Any security given or delivered with or as a bonus on account of any purchase of securities or other thing of value, shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value. The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include a subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent, by a circular, letter, or advertisement or otherwise, including the deposit in a United States Post Office or mail box or in any manner in the United States mails within this State of a letter, circular or other advertising matter. Nothing herein shall limit or diminish the full meaning of the terms "sale," "sell" or "offer for sale" as used by or accepted in courts of law or equity. The sale of a security under conditions which entitle the purchaser or subsequent holder to exchange the same for, or to purchase some other security, shall not be deemed a sale or offer for sale of such other security; but no exchange for or sale of such other security shall ever be made unless and until the sale thereof shall have been first authorized in Texas under this Act, if not exempt hereunder, or by other provisions of law.

F. The terms "fraud" or "fraudulent practice" shall include any misrepresentations, in any manner, of a relevant fact; any promise or representation or prediction as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; the gaining, directly or indirectly, through the sale of any security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable; any scheme, device or other artifice to obtain such profit, fee or commission; provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity.

G. "Issuer" shall mean and include every company or person who proposes to issue, has issued, or shall hereafter issue any security.

H. "Broker" shall mean dealer as herein defined.

I. "Mortgage" shall be deemed to include a deed of trust to secure a debt.

J. If the sense requires it, words in the present tense include the future tense, in the masculine gender include the feminine and neuter gender, in the singular number include the plural number, and in the plural number include the singular number; "and" may be read "or" and "or" may be read "and".

K. "No par value" or "non-par" as applied to shares of stock or other securities shall mean that such shares of stock or other securities are without a given or specified par value. Whenever any classification or computation in this Act mentioned is based upon "par value" as applied to shares of stock or other securities of no par value, the amount for which such securities are sold or offered for sale to the public shall be used as a basis of such classification or computation.

L. The term "include" when used in a definition contained in this Act shall not be deemed to exclude other things or persons otherwise within the meaning of the term defined.

M. "Registered dealer" shall mean a dealer as hereinabove defined who has been duly registered by the Commissioner as in Section 15 of this Act provided.

N. "Investment adviser" includes a person who, for compensation, engages in the business of advising another, either directly or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities or a person who, for compensation and as part of a regular business, issues or adopts analyses or a report concerning securities, as may be further defined by Board rule. The term does not include:

(1) a bank or a bank holding company, as defined by the Bank Holding Company Act of 1956 (12 U.S.C. Section 1841 et seq.), as amended, that is not an investment company;

(2) a lawyer, accountant, engineer, teacher, or geologist whose performance of the services is solely incidental to the practice of the person's profession;

(3) a dealer or agent who receives no special compensation for those services and whose performance of those services is solely incidental to transacting business as a dealer or agent;

(4) the publisher of a bona fide newspaper, news magazine, or business or financial publication of general and regular circulation; or

(5) a person whose advice, analyses, or report does not concern a security other than a security that is:

(A) a direct obligation of or an obligation the principal or interest of which is guaranteed by the United States government; or

(B) issued or guaranteed by a corporation in which the United States has a direct or indirect interest and designated by the United States Secretary of the Treasury under Section 3(a)(12), Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(12)), as amended, as an exempt security for purposes of that Act.

O. "Federal covered investment adviser" means an investment adviser who is registered under the Investment Advisers Act of 1940 (15 U.S.C. Section 80b-1 et seq.), as amended.

P. "Investment adviser representative" or "representative of an investment adviser" includes each person or company who, for compensation, is employed, appointed, or authorized by an investment adviser to solicit clients for the investment adviser or who, on behalf of an investment adviser, provides investment advice, directly or through subagents, as defined by Board rule, to the investment adviser's clients. The term does not include a partner of a partnership or an officer of a corporation or other entity that is registered as an investment adviser under this Act solely because of the person's status as an officer or partner of that entity.

Q. "Registered investment adviser" means an investment adviser who has been issued a registration certificate by the Commissioner under Section 15 of this Act.

**Sec. 29. Penal Provisions**. Any person who shall:

A. Sell, offer for sale or delivery, solicit subscriptions or orders for, dispose of, invite offers for, or who shall deal in any other manner in any security or securities without being a registered dealer or agent as in this Act provided shall be deemed guilty of a felony of the third degree.

B. Sell, offer for sale or delivery, solicit subscriptions to and orders for, dispose of, invite orders for, or who shall deal in any other manner in any security or securities issued after September 6, 1955, unless said security or securities have been registered or granted a permit as provided in Section 7 of this Act, shall be deemed guilty of a felony of the third degree.

C. In connection with the sale, offering for sale or delivery of, the purchase, offer to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing in any other manner in any security or securities, whether or not the transaction or security is exempt under Section 5 or 6 of this Act, or in connection with the rendering of services as an investment adviser or an investment adviser representative, directly or indirectly:

(1) engage in any fraud or fraudulent practice;

(2) employ any device, scheme, or artifice to defraud;

(3) knowingly make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(4) engage in any act, practice or course of business which operates or will operate as a fraud or deceit upon any person, is:

(a) guilty of a felony of the third degree, if the amount involved in the offense is less than $10,000;

(b) guilty of a felony of the second degree, if the amount involved in the offense is $10,000 or more but less than $100,000; or

(c) guilty of a felony of the first degree, if the amount involved is $100,000 or more.

D. Knowingly violate a cease and desist order issued by the commissioner under the authority of Section 23A, 23B, or 23-2 of this Act shall be deemed guilty of a felony of the third degree.

E. Knowingly make or cause to be made, in any document filed with the commissioner or in any proceeding under this Act, whether or not such document or proceeding relates to a transaction or security exempt under the provisions of Sections 5 or 6 of this Act, any statement which is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect shall be deemed guilty of a felony of the third degree.

F. Knowingly make any false statement or representation concerning any registration made or exemption claimed under the provisions of this Act shall be deemed guilty of a state jail felony.

G. Make an offer of any security within this State that is not in compliance with the requirements governing offers set forth in Section 22 of this Act shall be deemed guilty of a state jail felony.

H. Knowingly make an offer of any security within this State prohibited by a cease publication order issued by the Commissioner under Section 23C of this Act shall be deemed guilty of a state jail felony.

I. Render services as an investment adviser or an investment adviser representative without being registered as required by this Act shall be deemed guilty of a felony of the third degree.

J. A conviction of an offense under this section may be enhanced as provided by Section 12.42, Penal Code.

**Sec. 29-1. Limitation.** An indictment for an offense under Subsection C of Section 29 may be brought only before the fifth anniversary of the day on which the offense is committed.

**Sec. 29-2. Aggregation of Amounts Involved in Securities Fraud.** When amounts are obtained in violation of this Act under one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense.

**Sec. 31. Construction.** Nothing herein contained shall limit or diminish the liability of any person or company, or of its officers or agents, now imposed by law to prevent the prosecution of any person or company, or of its officers or agents, for the violation of the provisions of any other statute.